**WESTWARD COACH MANUFACTUR-ING COMPANY, Inc., Ray Grainger, Trustee (in bankruptcy) of Westward Coach Manufacturing Company, Inc., Plaintiffs,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. IP 65-C-199.**

United States District Court
S. D. Indiana,
Indianapolis Division.

July 29, 1966.

---

Robert A. Spray, Indianapolis, Ind., for plaintiffs.

Ice, Miller, Donadio & Ryan, by Harry T. Ice, James Hawes Jr., Indianapolis, Ind., John R. Spielman, Dearborn, Mich., for defendant.

## MEMORANDUM OPINION

HOLDER, District Judge.

The plaintiff, Westward Coach Manufacturing Company, Inc., commenced its action on April 28, 1965, when it filed a three count complaint charging the defendant, Ford Motor Company, with infringement of an alleged common law trade-mark in count one; with unfair competition in count two; and with infringement of an Indiana statutory trade-mark in count three. Jurisdiction of the Court is alleged in each count of the complaint to be based upon diversity of citizenship and the amount in controversy exceeding, exclusive of interest and costs, the sum of $10,000.00. Judgment is requested in each count of $3,000,000.-00 for compensatory damages; for puni-

tive damages; for an injunction to perpetually restrain defendant, directly and through its agents and dealers, from using the trade-mark MUSTANG with the representation of a charging horse in the State of Indiana, and throughout the world; for attorney fees; for costs of the action; and such other and further relief as is just.

## ISSUES OF COMPLAINT AND ANSWER

The June 21, 1965, answer of the defendant, consisting of one defense to each of the three counts of the complaint, admitted and denied specific allegations of the complaint.

The alleged facts of count one of the complaint were realleged in counts two and three. The allegations of count one and the issues joined therewith by defendant's answer are as follows:

The plaintiff alleged and the defendant admitted the allegations of rhetorical paragraphs one, two and three: that Westward Coach Manufacturing Company, Inc. was incorporated in the State of Indiana, with its principal place of business situated in the City of Elkhart, State of Indiana; that Ford Motor Company was incorporated in the State of Delaware, was admitted to do and was doing business in the Indianapolis Division of the United States District Court for the Southern District of Indiana; that the plaintiff and defendant were of diverse jurisdictions when the action was commenced; and the matter in controversy in the action exceeded, exclusive of interests and costs, the sum of Ten Thousand Dollars ($10,000.00).

The plaintiff alleged and the defendant denied the allegations of rhetorical paragraphs four through fourteen (except the matters in parenthesis) that for several years past and since at least about the year 1960, the plaintiff conducted an extensive business of selling mobile home units in interstate commerce throughout the United States; on or about the month of September, 1960, the plaintiff adopted as a trade-mark in its business for a mobile home unit of the type carried on a vehicle and known as a camper, the mark MUSTANG and a representation of a charging horse, and in the year 1962 the same trade-marks were adopted by plaintiff in its business for a mobile home unit of the trailer type; that plaintiff continued to extensively use such trade-marks in its business to the commencement of this action applied to its mobile home units of the trailer and camper types, and has not abandoned them; that plaintiff has continuously been the owner and was entitled to the exclusive use of the trade-marks during such time as applied to such mobile home units and to such other vehicles as are of sufficiently close relationship as to cause confusion and as to such other vehicles as would come within a reasonable expansion of plaintiff's business; such trade-marked mobile home units were of high grade and superior quality and were widely and extensively advertised and sold throughout the States of the United States; that the trade-mark, when this action was commenced, identified and distinguished the mobile home units of the plaintiff and is so understood by and known to distributors and dealers of mobile home units and to the general public; (that defendant admitted it started exhibiting one of its automobiles as a non-production model "display car", together with the mark MUSTANG) but defendant denied its automobile was exhibited with a representation of a charging horse as alleged by the plaintiff; (defendant admitted that in April of 1964 it began wide-scale production and national sales and advertising of automobiles bearing the mark MUSTANG and a representation of a charging horse) but defendant denied the plaintiff's allegation that, upon plaintiff's information and belief, the defendant had used the marks with intent to appropriate them to its own use and benefit; that defendant advertised its automobile as an "econo-

my" car, in contrast to the superior quality of the plaintiff's non-self-propelled mobile home units which were more expensive than the defendant's self-propelled unit; that by the defendant's production, advertising, and/or sale of its automobile under the mark MUSTANG, and/or a representation of a charging horse, has and is infringing the trade-mark rights of the plaintiff for the reason that automobiles are closely related to and in the same general field as plaintiff's mobile home units, to-wit; vehicles, and the attributes and disabilities of the defendant's automobile, and/or defendant, have been transferred to the plaintiff and plaintiff's mobile home units, and there was a resulting confusion to the public by the usage of the same or similar marks on such closely related goods of the same general class of vehicles, and there has resulted an undue restriction of the field in which plaintiff's trade-marks are accorded exclusiveness of use; (the defendant admitted plaintiff gave it written notice of the alleged infringement when the defendant "displayed" its automobile before its distribution and sale and again after the defendant had distributed and sold its automobile) but the defendant denied that it ignored and continued to ignore plaintiff's rights (and defendant admits its use of the mark MUSTANG has increased with the increased sale of its automobile bearing the mark); that the confusion and trade-mark infringement resulting from the defendant's use of the marks caused and will continue to cause damage to the plaintiff by loss of sales, prestige, reputation, and by unduly restricting the field in which plaintiff's trade-marks were accorded exclusiveness of use; and that due to the nature of the harm to the plaintiff it has no adequate remedy at law.

The alleged facts of count two of the complaint and the issues joined therewith by the defendant's answer are as follows:

The plaintiff alleged and the defendant denied the allegations of rhetorical paragraph sixteen: that the defendant, by its production, advertising, and/or sale of automobiles under the mark MUSTANG and/or a representation of a charging horse, had engaged in unfair competition with the plaintiff and engaged in unfair business practices by unjustly appropriating to defendant's own use and using plaintiff's property right, to-wit; plaintiff's trade-marks, on goods closely related to plaintiff's goods, and in the same general class, to-wit; vehicles, and in unduly restricting the field in which plaintiff's trade-marks are accorded exclusiveness of use; and in thereby effectively blocking the natural expansion of plaintiff's business into the mobile home units of self-propelled type for which plaintiff could otherwise exclusively use the marks in which plaintiff has built up good will sales appeal.

The alleged facts of count three of the complaint and the issues joined therewith by the defendant's answer are as follows:

The plaintiff alleged and the defendant denied the allegations of rhetorical paragraphs eighteen, nineteen, and twenty: that the plaintiff is the owner of trade-mark registration no. 5005–839, registered January 9, 1962, which was issued by the State of Indiana for utility coaches, vehicle-carried accommodations for campers and travelers, vans, and the like; that the scope of goods protected by the registration encompasses the defendant's alleged usage, and/or the scope extends to and includes the alleged usages by the defendant for the reason that the attributes of the defendant's automobile, and/or defendant, have been transferred to the plaintiff and plaintiff's mobile home units, and there was a resulting confusion to the public by the usage of the same or similar marks on such closely related goods of the same general class of vehicles, and there has resulted an undue restriction of the field in which the plaintiff's registered trade-marks are accorded exclusiveness of use, and prevented the natural expansion of the plaintiff's

business; that the defendant, by its production, advertising, and/or sale of its automobile under the mark MUSTANG, and/or representation of a charging horse, in the State of Indiana, has and is violating plaintiff's Indiana State Trade-Mark Registration, and the defendant infringed on the Indiana trade-mark rights of the plaintiff protected by such registration.

## HISTORY OF ACTION

It was disclosed at a scheduled pre-trial conference on January 6, 1966 that the plaintiff had recently filed a reorganization proceeding under Chapter XI of the Bankruptcy Act in the South Bend Division of the United States District Court for the Northern District of Indiana as Bankruptcy Cause Number 6191. Thereafter, on February 4, 1966, Ray Grainger, Trustee of Westward Coach Manufacturing Co., Inc., appointed by that Court, petitioned this Court to be added as a party plaintiff as authorized and directed by that Court to do. The Trustee was added as a party plaintiff pursuant to an order entered February 8, 1966.

Ford Motor Company filed a counter-claim for a Declaratory Judgment against the original plaintiff on November 4, 1965, before the addition of the Trustee as a party. The counter-defendant moved on June 29, 1966, for permission to file its late reply.

Ford Motor Company filed a Motion for Summary Judgment on February 21, 1966, upon all counts of the complaint and upon its counterclaim. On July 6, 1966, Ford Motor Company moved to withdraw that part of its Motion seeking Summary Judgment upon its counterclaim which was granted, and that part of the Motion is stricken.

The matter is submitted for the Court's ruling upon the defendant's February 21, 1966, Motion for Summary Judgment, as amended by the defendant on July 11, 1966, removing the issues of the counterclaim for a Declaratory Judgment from the Summary Judgment Motion; the evidence offered in support and in opposition to the Motion, the supporting defendant's brief filed February 21, 1966; the plaintiffs' answer brief in opposition filed March 11, 1966; the defendant's reply brief filed April 7, 1966; the plaintiffs' supplemental answer brief in opposition filed June 8, 1966; and the defendant's supplemental reply brief filed June 21, 1966. The parties waived oral argument upon the issues of the Motion. The Court being advised in the matter submits this memorandum ruling.

## FACTS

### (A) History of MUSTANG and Horse Depiction.

The word MUSTANG is not a distinctive or novel word and was not originated by the plaintiffs, their predecessor user, or the defendant. It is a noun identifying the wild or half-wild horses of the Southwest United States and Mexico descended from the stock introduced by the Spanish conquistadores. It was derived from the Spanish word "mestengo", an adjective, meaning "wild, having no conqueror". The word, as so defined, has been in common usage for over one hundred and fifty years. In 1380, a small kingdom of Nepal was founded and named MUSTANG. Since the war among the states, a United States Naval Officer who had been promoted from the enlisted classification was proudly dubbed a MUSTANG. The Southern Methodist University football team is popularly referred to as the MUSTANGS. During World War II, a famous allied attack plane was known the world over as the MUSTANG. The word was used as the name of many products before and since the plaintiff adopted its use in the year 1960 including tractors, motorcycles, engines, trucks manufactured in England and Japan, automobile parts, cranes and clothing. It has been registered in the United States Patent Office alone and in combination with the representation of a horse as a trade-mark at least thirty-four times for a variety of products. It was federally registered for trailers and truck trailers prior to plaintiff's use.

Plaintiff filed an application on November 28, 1962, with the United States Patent Office for registration of the name MUSTANG and a representation of a horse and before it could proceed with such application it was required to institute proceedings for the cancellation of the mark previously registered by the United States Patent Office to a trailer manufacturer on the grounds of abandonment. That application is still pending since it is opposed by White Motor Company who claims the mark as federally registered previously and in use and from whom plaintiff purchased and used for a long time on plaintiff's products the White Motor Company chrome MUSTANG hood ornament with the name "White" upon the depicted horse. White Motor Company's registered mark is the word MUSTANG for its truck engines and it is displayed prominently on the hoods of the White vehicles.

The representation of a horse in trademarks in some form had been in use before the predecessors of plaintiffs' use and is still used on hundreds of products as exampled by some two hundred and sixty-six trade-mark registrations in evidence, ten of which included the word MUSTANG. Porsche and Ferrari automobiles sold in the United States use the horse representation thereon, both before and since plaintiffs' use.

### (B) Plaintiffs' Products, Adoption of and Use of Mark

E. Edward Enochs was first gainfully employed in the trailer industry as a salesman for a retail dealer in the year 1954 and continued in the retail business of the industry as a salesman of dealers and as a dealer until 1959 and early 1960. Commencing in 1959 in Phoenix, Arizona, he claims he started and completed designing in eight months a unique new trailer of wood construction that would be strong and rugged, that would be equipped with modern conveniences with livable features and a quality far superior in appearance and more modern utility features than the trailers then marketed. In casting about for a name to associate with his new product, he settled upon the name MUSTANG with the representation of a horse because his product was a wild design and idea in the industry at that time. He was then aware of the dictionary definition of the word MUSTANG and the reputation of the fighter plane of World War II named MUSTANG. Mr. Enochs built the first trailer of such design in Lafayette, Indiana, and later contracted for the construction of his designed trailers with independent contractors which practice continued until September of 1962. The business was moved to Elkhart, Indiana, in late 1960, or early 1961, and commencing in 1962 the plaintiffs commenced and have continuously since manufactured Mr. Enochs' designed trailers. Mr. Enochs' early undertakings were in his own name and later the business was conducted by Mr. Enochs as the owner in the name of Westward Coach Manufacturing Company. The business and assets were transferred to the plaintiff, Westward Coach Manufacturing Company, Inc., an Indiana corporation, when it was incorporated September 21, 1962. Plaintiffs have not applied to do business in any other state. Mr. Enochs and members of his family, up to the time of the filing of this action, were the sole stockholders of the plaintiff corporation. Mr. Enochs, the principal stockholder, continued to be the principal executive and driving force of the corporation and members of his family participated in its developing business.

The trade-mark claimed by the plaintiffs was first used on their products in September of 1960. It has been continuously used since that time by plaintiffs. Plaintiffs' predecessor applied for an Indiana State Trade-Mark registration on January 9, 1962, and received Indiana State Trade-Mark Registration No. 5005–839 dated January 9, 1962, for the word MUSTANG and a pictorial representation of a leaping horse, the goods being identified in the registration as utility coaches, vehicle-carried accommodation for campers or travelers, vans and the like. No other state was requested to grant such a registration. Plaintiff

made application for Federal trade-mark registration on November 28, 1962, (Serial No. 158,116) for the word MUSTANG and a pictorial representation of a leaping horse, the goods sought to be covered were utility coaches, vans, vehicle-carried accommodation for campers and travelers. The goods were changed during prosecution of the application to utility van bodies mountable on pick-up trucks and small trucks for providing trailer-type housing and storage accommodations for travelers and sportsmen, coach bodies known as campers for providing such accommodation and mountable on an associated vehicle or carrying unit such as a truck or boat unit (pontoon frame) and trailers. The United States Patent Office has not granted the application although that office, by its action letter of November 2, 1964, stated that the application appears to be entitled to registration and was duly published in its official Gazette. The application is opposed by the White Motor Company, No. 44,753, whose filed opposition is pending. The White Motor Company has never claimed that the use of the mark by the plaintiffs was an infringement of its rights. The plaintiffs and their predecessor duly notified any known user of their mark in the trailer industry and instituted litigation against those who persisted in doing so except the White Motor Company.

The trailer industry, in which plaintiffs' line of business is classified, manufactures to order and sells the products wholesale to dealers who retail them at suggested markup prices to the ultimate consumer. There are some direct sales by the manufacturer to the consumer. The products of the industry comprise a unit equipped for human habitation, temporarily or permanently, and are equipped to be readily moved from place to place, although the product may be equipped and adapted to other uses. There are several types of trailers, the sport types being the "pick-up camper trailer" and the "travel trailer"; the permanent type known as the "mobile home"; and the "motor home" which is possibly a compromise between the use of the "camper" and "mobile home" types. The "pick-up camper trailer" has no wheels but is generally transported by being carried on the bed of one and one-half ton pick-up motor trucks manufactured by the automotive industry made possible by the trailer manufacturers constructing trailers to the size of the motor truck bed. The "travel trailer" is usually larger than the "pick-up camper"; it has wheels but is transported by placing a device on the rear of a passenger automobile or motor truck, called a "hitch", manufactured by the automotive industry, and by this means is transported by pulling or towing of the trailer. It is adapted principally for touring. The "mobile home trailer" is similar to the "travel trailer" except it is usually larger, for more permanent use as a dwelling, is less desirable for touring because of its size yet has the mobile feature of the trailer for relocation when desired. The "motor home trailer" is a trailer permanently attached to a motored chassis and is principally adapted for touring purposes. There are other sub-types of these trailers. The plaintiffs and their predecessor, while classified in the trailer industry, were new in the industry and had the following sales and production record:

Year-Gross Sales — Units of Trailers, All Names with Horse Emblem

| 1960 | $ 33,467.00 | 20 Units of camper trailers |
| 1961 | $183,744.45 | 112 Units of camper trailers |
| 1962 | $280,385.83 | 176 Units (174 camper and 2 travel trailers) |
| 1963 | $414,399.00 | 319 Units (127 camper and 92 travel trailers) |
| 1964 | $592,166.00 | 308 Units (94 camper and 214 travel trailers) |
| 1965 | $794,116.00 | 393 Units (62 camper and 331 travel trailers) |

The sales and production record of plaintiffs and their predecessor with the claimed expense of advertising developing and which resulted from the use of the mark are as follows:

| Year-Gross Sales MUSTANG Products— | Number Trailers | Adv. Exp. |
|---|---|---|
| 1960 $ 31,467.00 | 20 camper trailers | $ 2,899.33 |
| 1961 $176,069.00 | 107 camper trailers | $11,256.91 |
| 1962 $248,778.00 | 123 camper trailers | |
| | 3 travel trailers | $14,244.45 |
| 1963 $366,227.00 | 91 camper trailers | |
| | 79 travel trailers | $22,407.10 |
| 1964 $307,801.00 | 66 camper trailers | |
| | 90 travel trailers | $42,953.70 |
| 1965 $696,786.00 | 47 camper trailers | |
| | 239 travel trailers | $40,185.81 |

The plaintiff had plans to manufacture and sell trailers of all types and did manufacture a few other types. He showed them as well as disclosed drawings of types other than those produced and sold (the camper and travel trailer types). The plaintiff's production plant and office was situated on four and one-half acres of land. The real estate and plant facilities of plaintiff are leased from E. Edward Enochs and wife. It employed fifty men. It undertook the expansion of the manufacturing plant in 1964 to four times the plant capacity of 1963 so that the plant thereafter had a seven hundred to eight hundred unit production capacity per year. The peak demand, experience taught the plaintiff, was in the good weather months of March, April, May and June as weather affects sales. After the expansion, the production of units dropped below the 1963 production records but in 1965 production exceeded the 1963 and 1964 records. The plaintiff used various names on its products such as "MUSTANG", "MUSTANG with PENTHOUSE", "PALOMINO", "STUD", "STALLION", "COLT" and "PINTO". All, except MUSTANG, were used on economy models. The MUSTANG mark with the representation of a horse has been predominantly used and advertised on plaintiffs' and their predecessor's products throughout their existence in the industry. The design of the horse used on the products differed from one designed by plaintiff's advertising agent, Victor Wessolhoft, to the White Motor Company design and to one furnished by a supplier. It was affixed in differing manners, chrome and plastic replicas, decals and paintings. Plaintiffs' horse representation is different than any horse representation used by the defendant. Plaintiffs and their predecessor have about seventy to eighty competitors in the industry, that is competitors in the sense that they were manufacturers of trailers of varying qualities, design and price. The plaintiff's products were wholesale priced from $1,995.00 to $2,600.00 and to $2,895.00. Only the aluminum trailers manufactured by two or three competitors were priced higher than plaintiff's trailers. Plaintiff's MUSTANG self-contained models (fully equipped) were wholesale priced at $2,395.00. Plaintiff's customers were primarily dealers numbering from one hundred to one hundred twenty-five, none of whom were franchised. Some of these dealers were also in the motor vehicle (truck and passenger automobile) sales business scattered in some states but primarily in the mid-west. Plaintiff's potential future market appeared to be new or used car dealers of any make of auto-

mobile. Plaintiff's product was and is available for use by the ultimate purchaser with any motor vehicle of any manufacturer and will continue to be the same in the potential future market. The plaintiff does not build motor vehicles and has no plans to do so. The plaintiff had plans to assemble his constructed trailer unit onto a motored chassis purchased from any automobile manufacturer.

### (C) Defendant's Products, Adoption and Use of the Trade-Mark

The defendant is a pioneer in the automotive industry in the manufacture and sale of truck and passenger vehicles. Its passenger vehicles are popularly known as Ford, Mercury and Lincoln. These models are further distinguished by secondary names of Thunderbird, Galaxie, Fairlane, Falcon, Mustang and Continental. Other competing manufacturers in the automotive industry follow the same general plan of the use of model names and secondary names. The defendant manufactures and sells chassis, trucks and passenger automobiles that are convertible for use in the trailer industry or by the ultimate user of a trailer of all kinds. The defendant does not manufacture or sell the trailer products of the industry to which plaintiffs are affiliated and defendant has no plans to do so. Some other members of the automotive industry have entered the trailer field in competition with plaintiffs. Defendant does not manufacture and sell the converting material necessary to make a trailer use of its automotive products but leaves such to the trailer industry and other industries. The trailer industry, including plaintiffs' business and their customers, is dependent upon the products of the automotive industry, including defendant's business, to provide mobility for the full use of the trailer by the user. Thus, there is a common market of users and dealers for the automotive and trailer industries. The defendant, as does the automotive industry, markets its products through independent franchised distributors and dealers throughout the United States who advertise and sell the new products of defendant and advertise and sell the trade-in used products of all automotive manufacturers. The automotive dealers also buy, advertise and sell new and used trailers as well as other products.

The defendant, as do the other members of the automotive industry, advertises extensively its automotive products. The potential and present markets of the automotive industry are far greater than that of the trailer industry. Included in the advertising of defendant is the communication directed to the potential and present trailer owner of the adaptation of its products to use in that field. Defendant has engaged in joint promotion with trailer manufacturers and at one time accepted the proposal of plaintiff's former sales manager for a joint promotion that was not consummated. Plaintiff's former president was a member of an awards committee of a trailer trade association and he personally approved of the committee's bestowal of an award to defendant for its outstanding advertising promotion beneficial to the trailer industry. The defendant does not manufacture, or sell, or advertise any unit of its products under the secondary name of MUSTANG depicting a horse which is convertible to the use of a trailer other than as a towing facility for the product of the trailer industry. The defendant, as do others in the automotive industry, provides a written warranty of its products, including its MUSTANG automobile, to the ultimate purchaser and user when the automobile is acquired from the dealer.

The massive advertising by the defendant and of its franchised distributors and dealers of defendant's products, including the MUSTANG automobile, together with the practice of the delivering of the written warranty to buyers clearly communicated at all times in question beyond any doubt to the public that the defendant was the manufacturer, seller and warrantor of the MUSTANG automobile. The force of the massive advertising left no doubt in the public mind of the defendant's origination of the MUSTANG

automobile even if the public was in the past or in the future were to become acquainted with the extensive history of prior use of the name MUSTANG accompanied by the representation of a horse by many other manufacturers with their many products. The public has never been, is not now, nor ever will or could be confused, or misled, or deceived by the defendant in the use of the name MUSTANG, accompanied by a representation of a horse, that any one other than the defendant was the originator, seller and warrantor of the MUSTANG automobile. There is no likelihood that the public has been, is now, ever will or could be confused over whether or not the plaintiffs were, or are the originators, sellers and warrantors of the MUSTANG automobile.

During the year 1962, the defendant manufactured an experimental economy sports vehicle which it named MUSTANG. It was not produced for sale but was displayed at vehicle shows. The plaintiff, on December 10, 1962, notified the defendant of defendant's use of its trade-mark which plaintiff had been using since September of 1960 with trailers and requested defendant, among other matters, to honor its trade-mark. The defendant acknowledged plaintiff's protesting letter and among other matters stated it was a premature accusation of invasion of rights as the use of the name was on a displayed vehicle which was not in production. In 1964, the defendant went into the mass production and sale of the vehicle with secondary name of MUSTANG accompanied by the representation of a horse. It is classed as a sports vehicle priced from the low $2,000.00 into the $3,000.00 price depending upon the choice of the purchaser of extra equipment. The production and sale was accompanied by an immediate $6,000,000.00 advertising program and promotion program. Because of such programs, there was no doubt on the public's part as to whom originated the automobile from the time it was marketed. Since such initial production, another $10,000,000.00 has been expended by the defendant in advertising and promotion programs of its automobile and the secondary Ford name of MUSTANG accompanied by the representation of a horse. Because of such continued programs, there has been no change of mind on the public's part as to whom originated the automobile. After notifying the defendant, on April 9, 1965, of its claim of infringement, the plaintiff commenced this action on April 28, 1965.

While the name MUSTANG, as used by the defendant, is the same word as that used by the plaintiffs, it is presented and displayed differently than as used by the plaintiffs and while the representation of a horse alone or accompanied by the name MUSTANG as used by the defendant is different than the three used by the plaintiffs and is presented and displayed differently by the defendant than as used by the plaintiffs, the mark is substantially that as used by the plaintiffs and the many others who enjoyed prior use with many products.

## LAW OF THE CASE

■ The plaintiffs' Indiana and common law trade-mark is limited to its use with the products of the trailer industry. Plaintiffs have no trade-mark rights thereunder so far as its use with the automotive industry products with which defendant is identified. The defendant is not a competitor of plaintiffs in the trailer business and defendant's use of the name MUSTANG in conjunction with the representation of a horse with its automotive products is not infringing plaintiffs' Indiana and common law mark as so limited to the trailer industry.

■ The plaintiffs' trade-mark is limited because it is not an original creation (coined or fanciful name) of plaintiffs as disclosed by the recited facts. It was limited to the secondary meaning acquired by plaintiffs' use and registered declared use thereof. The secondary meaning to the word MUSTANG and the representation of a horse therewith as used by plaintiffs was acquired in the trailer industry and market despite the many uses thereof by others as disclosed

by the recited facts. Because of the nature of the Summary Judgment Proceeding in this posture of the case, the fact cannot be questioned that plaintiffs' mark had acquired such secondary meaning with small expenditures in promotion and advertising within the short time of approximately two years before defendant displayed its first use and approximately three years and four months before the defendant began to use the MUSTANG name and horse representation in production of automobiles which mark was old and shared by many others on a wide variety of products. The plaintiffs cannot extend their weak mark beyond the secondary meaning that it had acquired.

The defendant has avoided any claim of confusion of origin of its automotive product by immediately and continually informing the public that the MUSTANG automobile was a product of defendant. From the outset of the MUSTANG automobile's production it has acquired a secondary meaning in the automobile industry and in that market. There is no deception of the public or likelihood of public confusion, or the palming off of defendant's product upon the good name, or service, or other attributes of plaintiffs' enterprise that it may have acquired. The public is informed that the MUSTANG automobile is a product of defendant.

Before reaching a decision on plaintiffs' claim of defendant's dilution of plaintiffs' property in the mark, there must be a fair appraisal of what was plaintiffs' property. The evidence discloses, when stripped of the adjectives of accusation culminating in a demand of $3,000,000.00 damages which tend to embellish the true status of plaintiffs' property before the alleged dilution, that plaintiffs' predecessor first used the public property of a dictionary word MUSTANG with a horse on a hand-made trailer in September 1960; when the name belonging to the public was chosen it was widely used as a mark in a variety of fields and many of which were Federal trade-mark registrations; the prop-

erty value in the mark was developed, plaintiffs claim, in a little over two years by furnishing the trailer market with 253 trailers using the mark, all but three of which were the smaller trailer campers (20 in 1960 grossing $31,467.00; 107 in 1961 grossing $176,069.00; and 126 in 1962 grossing $248,778.00); the plaintiffs claim that the property value in the mark was also developed in a little over two years by advertising and promotional expenditures of $28,400.69 ($2,899.33 in 1960; $11,256.91 in 1961; and $14,244.45 in 1962); by the end of 1962 plaintiffs' predecessor inequitably and ambitiously overclaimed its property interest in the mark not only in the trailer industry but also claimed it extended to the automotive industry products when the defendant first displayed its intended use of the name on its new sports automobile; thereafter the property value in the mark was further developed, plaintiffs claim, by their furnishing the trailer market with 326 trailers which used the mark (91 camper trailers and 79 travel trailers in 1963; and 11 camper trailers and 90 travel trailers in 1964); and during this same two year period the plaintiffs' predecessor was using various names identified with horses other than MUSTANG on 301 additional trailers which it furnished to the trailer market, the promotion cost of which is not disclosed; this further property value in the mark was developed by plaintiffs' claim of two years expenditures for advertising and promotion of $65,360.80 ($22,407.10 in 1963; and $42,953.70 in 1964). The defendant, in 1964, commenced the production and sale of the MUSTANG automobile with massive advertising and promotion thereof; the plaintiffs again inequitably and ambitiously overclaimed their property interest in the mark by requesting defendant to cease use of the name MUSTANG and the horse emblem and with renewed fervor they present their claims in this action. It is uncertain as to when the plaintiffs' mark matured from a dictionary publicly possessed name into distinctive property of plaintiffs. There is

a difference of opinion as to whether the defendant has and is violating plaintiffs' rights, as charged in this action, between the former executives and stockholders and the present executives and stockholders of plaintiff corporation. Mr. Thomas M. Tuttle testified under oath as follows:

"Q May I ask you, from what has been discussed earlier, did you give any consideration to the question of what, if any, value should be attached to the trademark of the word 'Mustang,' and the lawsuit that was pending for damages for an alleged infringement?

A In regard to the lawsuit, we did not want any part of this lawsuit, not even 10 per cent. This was the only arrangement that could be made out whereby we could acquire this company. We had to take it under a 'Chapter XI,' which, of course, is very expensive, and we are paying for this expense, and we didn't necessarily want to go this way, but Mr. Enochs' attorneys advised him that if the company was not a going concern, and coaches were not produced or made, that his lawsuit would be jeopardized. Therefore, it was worked out that he retain 90 per cent, and that the 10 per cent that we retain would be just an indication factor to the Court that the company was still operating. We couldn't care less about the suit that he has with the Ford Motor Company. We feel it is worthless, and we are in it to make trailers, and we are not in it to make some money on a lawsuit.

Q Is that, then, your understanding of the reason for this Chapter XI proceeding, the reason being that it was the only way by which there could be a set off to Mr. Enochs, this right under this lawsuit?

A That was my understanding, and that is the reason we are here under Chapter XI. We tried to buy it outright and form a different corporation. That was our original intention, and we had to go under Chapter XI. Our attorney advised us from the standpoint that we could eliminate any liabilities; if we didn't go under Chapter XI, we were going to form another corporation."

The foregoing are the factors, plus some blood, sweat and sacrifices of the former executive and principal stockholder, Mr. E. Edward Enochs, together with members of his family and a small, loyal group of employees, which are impossible even for them to describe, which developed the property right from a publicly possessed name MUSTANG within the trailer industry but in the midst of, surrounded by, or hedged in by many other users of the mark in other fields.

Faced with the inevitable conclusion of the limitation of the weak trade-mark under the facts of the case and the established fact that the defendant has educated the public of the defendant's origination of the MUSTANG automobile and thereby destroyed any claim of confusion as to such being plaintiffs' product, the plaintiffs ask the Court to apply the "dilution doctrine". Plaintiffs assert that because of the plaintiffs and defendant having a common market of trailer and automobile dealers and ultimate users the massive advertising of the defendant has diluted and whittled away the value of plaintiffs' mark. The plaintiffs assert that the defendant's advertising was so convincing that the ultimate purchaser believes plaintiffs' product is the defendant's, or that plaintiffs are affiliates of defendant, or that plaintiffs have unfairly taken defendant's name; also that plaintiffs while they may in some respects benefit from defendant's advertising they have also received the effects of all of defendant's past and future mistakes and reputation including the fact that defendant's

MUSTANG is an economy automobile whereas plaintiffs' trailer is a prestige product; and also that the franchised dealers of competitors of defendant will no longer purchase plaintiffs' trailer, even though they are aware of the origin, because of their refusal to advertise the name MUSTANG and thereby bestow an unintended benefit to the competitive automobile of defendant. The plaintiffs further claim that since defendant's use of the mark it has been subject to embarrassing encroachment on the use of the mark by others in the trailer industry and litigation resulted with one such alleged infringer. The plaintiffs say the "dilution doctrine" operates to protect the owner of a trade-mark against use of his mark by others on products of different descriptive properties, on the theory that the value of trade-marks, built up through extensive advertising and a good business reputation over a period of many years, would be gradually diminished by dilution, even though use of the mark by others could not lead to any confusion.

The State of Indiana, the situs of plaintiffs' business and in which the defendant is doing business, has no legislative dilution law and no common law precedent has been established by its courts. The United States Supreme Court has expressed no opinion on the doctrine. Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810. Five states, Illinois, Massachusetts, New York, Georgia and Connecticut, have adopted anti-dilution statutes. The State of Michigan, in which defendant has its principal manufacturing plant, has not legislatively adopted the anti-dilution doctrine but a United States District Court in Michigan in an opinion, without adopting the doctrine, observed that the doctrine has been sparingly applied. Consolidated Cosmetics et al. v. Neilson Chemical Co., 109 F.Supp. 300, 310. Because of the pendency of plaintiffs' opposed application for a Federal trademark, it is also observed that Congress has not adopted an anti-dilution law. Absent a statute, is there a common law doctrine of dilution governing the rights

and duties of these parties to each other? The defendant disputes this and urges that the dilution doctrine has not been accepted by the courts as unqualifiedly as the plaintiffs urge. G. B. Kent & Sons v. P. Lorillard Co., D.C., 114 F.Supp. 621; Champion Paper & Fibre Company v. National Ass'n of Mutual Insurance Agents, 102 U.S.App.D.C. 10, 249 F.2d 525. It is unnecessary for the Court to adopt the doctrine for the States of Indiana or Michigan. Even if such common law doctrine was the law of the case, the facts of the case do not support plaintiffs' claim of violation of rights thereunder. The statutory provisions of states having the anti-dilution law and case law interpreting such laws exceed the common law doctrine of dilution. For example, the Illinois anti-dilution statute, Chapter 140, Section 22, Illinois Revised Statutes, which reads, so far as material with emphasis added:

"Every person * * * adopting and using a mark, * * * may proceed by suit, * * *, to enjoin subsequent use by another of the same or any similar mark, * * * if there exist a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, * * * notwithstanding the absence of competition between the parties *or of confusion as to the source of goods or services.*"

The common law doctrine does not go as far as the statutorily created right and remedy. The authorities of the statutory states must be examined with care and compared with the common law principles before applying the case law of statutory states. The common law doctrine differs from the emphasized portion of the Illinois Statute and the doctrine which plaintiffs say is the common law. Judge Weinfeld pointed out some factors of the common law doctrine as applied in the case of G. B. Kent & Sons v. P. Lorillard Co., D.C., 114 F.Supp. 621, 631:

"Judge Learned Hand has referred to it as the economic interest which a senior user has in his mark outside the field of his own exploitation.

While recognizing this right in the oft-quoted Yale Electric Corp. v. Robertson (2 Cir., 26 F.2d 972, 974) it is significant that Judge Hand noted, 'And so it has come to be recognized that, *unless* the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful.' Thus, it appears that we come back to the point from which we started—the element of likely confusion must be present. \* \* \* Analysis of the authorities, at least those in this circuit and in the New York State courts, demonstrates that in each instance it was hinged to a factual situation which involved either likelihood of confusion, tarnishment, reasonable likelihood of expansion by plaintiff to include the junior product, diversion of trade or other direct injury."

The many cases cited by the parties (common law or statutory dilution doctrine) have been examined and no case extended the doctrine unless one or more of the following facts (none of which exists in the facts of this case) were established, (1) the plaintiff had a strong mark (an original, or coined, or unique name) which in the public mind, had become associated solely with its products, such as "Kleenex", "Kodak", and "Polaroid" ; (2) the plaintiff had such a celebrated name that defendant's use would immediately connect it in the public mind with plaintiff. The Stork Club case is a typical example, Stork Restaurant, Inc. v. Sahati, 9 Cir., 166 F.2d 348; (3) a purchaser of defendant's products would think it emanated from the plaintiff because of the name; (4) likelihood of expansion of the plaintiff to include defendant's product; (5) diversion of plaintiff's trade to defendant; (6) tarnishment of plaintiff's good will; and (7) likelihood of confusion.

■ The evidence is that plaintiffs' mark is weak. It is not a celebrated mark, or original, or coined, or unique. It was in use by plaintiff for a short time before the defendant first used the mark on its display vehicle and its use ultimately in production and sale. Plaintiff's investment in advertising and promotion to develop it nationally was small. Plaintiff chose a mark that was much used as the name of many products, including tractors, motorcycles, engines, trucks manufactured in England and Japan, automobile parts, cranes, clothing and other products. It had been registered in the United States Patent Office alone and in combination with the horse as a trade-mark at least thirty-four times for a variety of products. The common law does not extend the doctrine to the plaintiffs against the defendant or any of the prior users for such a saturated and already diluted trade-mark. The financial records of the plaintiffs, except for the period of construction and immediately after in expanding its plant to four times its former production capacity, is one of success. Sales increased after the accused dilution of plaintiffs' mark. Since its bankruptcy reorganization the plaintiffs have continued the use of the mark MUSTANG and dropped the use of the other names.

When plaintiffs' predecessor chose and developed the weak mark, they accepted the weakness of the mark on the chance that others who were using the weak mark would dilute the mark as applied to plaintiffs' product by various means, including the conducting of a massive national advertising promotion of the other users' product so marked; and that some members of the public from such promotion would believe that plaintiffs' product is allied to the advertiser. Absent any other factor of unfair practice, plaintiffs would have no complaint for redress in law of such prior user smashing the market with his own product and mark. Plaintiffs have no right to the exclusive use of the mark under the facts of this case in all fields of products. Others, including the defendant, who enter the market place and adopt the weak mark for automotive products, or on products other than trailers, under the facts of this case, have the right to advertise the product and mark the same as the plaintiffs and the

prior users. Assuming the defendant was legally marked in the automotive field, then to support plaintiffs' dilution argument would be to say that it is unfair for the defendant to be so big financially as to be able to advertise and promote to such extent that it made a success of defendant's product in the automotive market which plaintiffs were unable to do financially in the trailer market before defendant, or that it was unfair for the defendant to advertise more than the plaintiffs and other prior users. The doctrine would hardly require a subsequent user, such as defendant, to limit its promotion to the plane of the plaintiffs and other prior users of the mark, if the subsequent user was legally marked, absent any unfair practice. The law encourages industry to peddle its wares. There was no unfairness in the quantity of advertising by the defendant under the facts of this case. The defendant's competitive market is the adult public, or near adult, in the fifty states, who are financially able to acquire a motor vehicle. Advertising on a massive scale in the automotive industry must be undertaken to reach this market. The defendant simply vied for its just market in the manner and method and according to the custom and usage of the national automotive industry.

Under the facts of this case, it may be concluded in this posture of the case, by force of the non-disputed fact requirement of Rule 56 of the Federal Rules of Civil Procedure, that plaintiffs were likely to expand to a motorized trailer, but there is no likelihood of plaintiffs expanding to include the defendant's products under the facts of this case to support a claim under the doctrine of dilution.

Under the facts of this case, there was no diversion of plaintiffs' trade to the defendant to support a claim under the doctrine of dilution.

Under the facts of this case, there is no likelihood of tarnishment of plaintiffs' good will to support a claim under the doctrine of dilution. That good will tarnishment, of which the plaintiffs are offended, was within the bounds of what the plaintiffs could have expected had they appraised the past, present and future when choosing the weak mark, and the possibility and even probability that other users, including subsequent users, would dilute this mark by massively advertising their own product.

Under the facts of this case, there is no likelihood of confusion of the origination of the plaintiffs' product to support a claim under the doctrine of dilution. That confusion of which the plaintiffs are offended was and is within the bounds of what the plaintiffs could expect. (the same as to their good will explained above). The prime buyers of the plaintiffs' products were the franchised dealers of the automotive industry together with dealers of trailers. Plaintiffs had no franchised dealers. Very few sales were made directly to the ultimate trailer user. The independent franchised automobile dealer of the various manufacturers of automobiles, and the trailer dealers, buy, sell, trade, advertise and promote the automobiles and trailers of all manufacturers. The franchised dealer, by contract, is committed to the contracted automobile product; nevertheless, to stay in the market place, he deals in other used automobiles and other products. The dealers and ultimate users, because of the high price range of automobiles and trailers, are discerning and informed buyers and there is no likelihood of their confusing plaintiffs' product as that of defendant and the confusion of which plaintiffs complain in this regard is clearly within the bounds of what rights were acquired in their weak mark so mortgaged to the corresponding rights of others to the same mark used on products in another industry.

There being no genuine issue as to any material fact, under the issues of the three counts of plaintiffs' complaint and the answer thereto, and that plaintiffs have no claim thereunder based in law, the defendant is entitled to judgment as a matter of law.

It is ordered that the Clerk enter judgment in favor of the defendant and against the plaintiffs on each of the three counts of the complaint with costs to be taxed in the manner provided by law.