388 F.2d 627
 156 U.S.P.Q. 437
 WESTWARD COACH MANUFACTURING COMPANY, Inc., and Ray
Grainger, Trustee in Bankruptcy of Westward Coach
Manufacturing Company, Inc., Plaintiffs-Appellants,
v.
FORD MOTOR COMPANY, Defendant-Appellee.
 Nos. 16043, 16071.
 United States Court of Appeals Seventh Circuit.
 Jan. 9, 1968, Rehearing Denied Feb. 7, 1968.
 
 Lloyd L. Zickert, Chicago, Ill., Robert A. Spray, Indianapolis, Ind., Donald L. Welsh, Chicago, Ill., for plaintiffs-appellants.
 Harry T. Ice, James E. Hawes, Jr., Indianapolis, Ind., John R. Spielman, Dearborn, Mich., for defendant-appellee.
 Before HASTINGS, Chief Judge, and KILEY and CUMMINGS, Circuit Judges.
 HASTINGS, Chief Judge.
 
 
 1
 This is an action for trademark infringement and unfair competition brought by plaintiffs-appellants Westward Coach Manufacturing Company, Inc. and Ray Grainger, trustee in bankruptcy, against defendant-appellee Ford Motor Company on April 28, 1965, in the United States District Court for the Southern District of Indiana.
 
 
 2
 The three-count complaint charges Ford with infringement of Westward's common law trademark in the word MUSTANG with the representation of a charging horse; infringement of Westward's Indiana statutory trademark in the same word and representation; and unfair competition. The complaint seeks $3,000,000 in damages, punitive damages and an injunction perpetually restraining Ford from using the mark MUSTANG and/or the representation of a charging horse in Indiana and throughout the world.
 
 
 3
 Upon the motion of Ford, and after a substantial record, including depositions, answers to interrogatories, affidavits, admissions of fact, and exhibits, was compiled, the district court entered summary judgment for Ford on July 29, 1966, pursuant to Rule 56(c), F.R.Civ.P., 28 U.S.C.A. Westward and Grainger appeal from that judgment.
 
 
 4
 Appellants E. Edward Enochs, Bernice Enochs and Buelah Vaught, all shareholders of Westward prior to its reorganization in bankruptcy (pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C.A.) and assignees of interests in this lawsuit, appeal from the judgment and from the district court's order of December 7, 1966, denying their motion to intervene and striking their amended complaint.
 
 
 5
 Westward was incorporated in Indiana on September 21, 1962, as a successor to the unincorporated Westward Coach Manufacturing Company. The unincorporated Westward was founded by the appellant E. Edward Enochs in 1960 and began manufacturing pick-up campers (campers suitable for mounting on pick-up trucks) in September of that year. After incorporation Westward also began manufacturing travel trailers, designed for towing by a truck or automobile, and a few chassis-mounted campers for trucks.
 
 
 6
 The trailer industry is a large one. In 1965, a partial listing of manufacturers in the industry occupied seventy pages of a trade journal. The industry's sales of campers and trailers in the period of 1960-65 exceeded 875,000 units, of which Westward accounted for 1,234 sales.
 
 
 7
 Westward's products are sold principally through unfranchised dealers, some (approximately fifteen percent at the time this action was brought) of whom were also franchised dealers for new automobiles and trucks.
 
 
 8
 Westward marketed its trailers and campers under the names 'Colt,' 'Palomino,' 'Pinto,' 'Stud,' 'Stallion,' and MUSTANG. The MUSTANG name was first used in September, 1960, on campers and was subsequently used on travel trailers. Westward reserved the name for its highest quality products. Of the 1,234 campers and trailers sold by Westward in the period of 1960-65, 865 bore the MUSTANG name.
 
 
 9
 In January, 1962, Westward received an Indiana trademark registration on the MUSTANG name and representation of a charging horse. The application stated that the mark would be used on 'utility coaches, vehicle-carried accommodations for campers or travelers, vans, and the like.'
 
 
 10
 Westward applied for federal registration of the mark on October 22, 1962. It overcame an opposition filed by White Motor Company and was issued a federal trademark on September 5, 1967. That trademark is for use on 'utility van bodies mountable on pick-up trucks and small trucks for providing trailer-type housing and storage accommodations for travellers and sportsmen, coach bodies known as campers for providing such accommodation and mountable on an associated vehicle or carrying unit such as a truck or boat unit such as a pontoon frame, and trailers * * *.' Westward's action is not founded on the federal trademark, and we may ignore it in this case.
 
 
 11
 Ford Motor Company is a leader in the automotive industry, manufacturing and marketing automobiles throughout the United States and in foreign countries. Consistent with industry practice, Ford markets its products through a nationwide system of independent franchise dealers.
 
 
 12
 In 1962, Ford built an experimental sports car which it exhibited at vehicle shows. The car, which was not initially produced for sale, was named MUSTANG and bore the representation of a running horse. Westward wrote Ford in December, 1962, notifying Ford that Westward had been using the MUSTANG name and horse representation since 1960, and requesting that Ford discontinue its use of the mark. In response, Ford expressed its opinion that Westward had no exclusive right to the MUSTANG trademark and that there was no likelihood of confusion of Ford's products with Westward's products.
 
 
 13
 Ford began producing its MUSTANG sports car for sale in April, 1964. In addition to the MUSTANG name and the representation of a running horse, the car bore the name Ford. The introduction of the car was accompanied by a $6,000,000 advertising and promotion campaign, and an additional $10,000,000 was expended for advertising before October, 1965. In its advertising, Ford prominently displayed the Ford name, identifying the MUSTANG sports car as a Ford product and a member of 'Ford's family of fine cars.' In the first eighteen months of production, Ford sold 645,416 MUSTANG automobiles.
 
 
 14
 Ford has manufactured and marketed a Ford Econoline truck outfitted with living accommodations and referred to in Ford's advertising as a 'camper.' It has also advertised certain of its pick-up trucks as 'Camper Specials.' It has published an advertising booklet entitled 'Ford Recreational Vehicles' and other publications promoting its products as recreational vehicles. It has engaged in joint promotions with trailer manufacturers. Ford does not manufacture or sell campers or travel trailers. However, some Ford dealers sell them in addition to Ford products.
 
 
 15
 Appellants allege that Westward has continuously and extensively used the name MUSTANG and representation of a charging horse in connection with its campers and trailers, and that through its extensive nationwide advertising and marketing effort the MUSTANG trademark had come to identify and distinguish its products. They allege that Westward's products and Ford's products are closely related and that Ford's use of the MUSTANG name and representation of a horse infringes Westward's trademark by creating a likelihood of confusion concerning the source of the products and by preventing Westward's expansion into the manufacture of selfpropelled recreational vehicles. The allegations as to unfair competition are substantially the same.
 
 
 16
 At a pre-trial conference on January 6, 1966, it was disclosed that Westward had filed a reorganization proceeding in the United States District Court for the Northern District of Indiana, pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C.A., and on February 8, 1966, appellant Grainger, the trustee in bankruptcy of Westward, was added as a plaintiff by order of the district court. The district court having jurisdiction of Westward's reorganization petition approved a plan assigning to the appellants E. Edward Enochs, Bernice Enochs, and Buelah Vaught an interest of approximately fifty percent in Westward's pending action against Ford, giving E. Edward Enochs the sole power to control the action, and charging him with the expenses of prosecuting the action. Five percent of the action was assigned to Westward, and the remainder to Westward's creditors, represented by the trustee, appellant Grainger.
 
 
 17
 The district court's order granting summary judgment to Ford was accompanied by an extensive memorandum opinion, which is reported at 258 F.Supp. 67 (1966). The court found no genuine dispute concerning the following facts. That the word MUSTANG is not a distinctive word, nor one originated by Westward or Ford, but is a noun of common usage denoting the wild or semiwild horses introduced into North America by the Spanish conquistadores. That prior to Westward's or Ford's use of the name MUSTANG, it was used in connection with a variety of products and had been federally registered as a trademark alone and in combination with the representation of a horse at least thirty-four times for a variety of products, including trailers. That there are at least 266 federal trademark registrations of a representation of a horse which are still in use. That Westward had used the trademark claimed by it continuously since September, 1960. That Westward's sales under the MUSTANG name totaled 579 units through 1964. That Westward's advertising and promotional expenditures, which were devoted principally to its MUSTANG campers and trailers, totaled $2,899.33 in 1960, $11,256.91 in 1961, $14,244.45 in 1962, $22,407.10 in 1963, and $42,953.70 in 1964. That Westward had no plans to build a motor vehicle, but did have plans to assemble trailer units on motorized chassis purchased from automobile manufacturers. And, that Ford's advertising and its warranty practices clearly communicated to the public beyond any doubt that Ford was the manufacturer, seller and warrantor of the MUSTANG automobile.
 
 
 18
 The court found as an undisputed fact that there is a common market of users and dealers for the sutomotive and trailer industries. It based this finding on these sub-findings: that Ford's chassis, trucks and automobiles are convertible for use in the trailer industry or by the ultimate users of trailers. That some members of the automotive industry, not including Ford, have entered the trailer market in competition with Westward. That the trailer industry and trailer users are dependent for mobility upon the products of the automotive industry.
 
 
 19
 On the basis of these findings of undisputed fact, the court concluded that no genuine issue of material fact was presented and that Ford was entitled to judgment as a matter of law. Specifically, the court's conclusions may be reduced to four.
 
 
 20
 First, the court held there is no likelihood of confusion concerning the origin of the MUSTANG automobile.
 
 
 21
 Second, it held that Westward's statutory and common law trademark is limited to products in the trailer industry. According to the court, since the name MUSTANG is not a coined or fanciful name, but a common noun, its application as a trademark is limited to the secondary meaning it acquired by Westward's use and registration of it.
 
 
 22
 Third, noting the common usage of the word MUSTANG, the short period of time between Westward's first use of the mark and Ford's first use of it, the small sum expended by Westward for advertising, the small production and sales of MUSTANG campers and trailers prior to Ford's use of the mark, the extensive prior and concurrent use of the mark on a wide variety of products and the extensive prior registration of the mark for a variety of products, the court concluded Westward's mark was weak.
 
 
 23
 Finally, the court concluded that because Westward's mark was weak, it could not extend protection of the mark beyond the narrow limits of its secondary meaning in the trailer industry.
 
 
 24
 In the court's view there is no likelihood, considering the significance of an automobile or trailer purchase and the discerning character of dealers and users of automobiles and trailers, of their confusing the origins of Ford's and Westward's products. Whatever confusion might result concerning the origin of Westward's products is, the court felt, within the risk Westward took by choosing and developing a weak trademark and is, for that reason, not actionable.
 
 
 25
 At the hearing on Ford's motion for summary judgment, on April 29, 1966, the parties Westward, Grainger, and Ford agreed that the motion presented substantive questions of law in the area of trademarks, tradenames and unfair competition. On oral argument before this court, counsel for appellants maintained that on the record there is likelihood of confusion as a matter of law, and that this court should so hold. Our review of the record discloses that the material facts are undisputed. The dispute on the merits is whether the type of confusion evidenced on the record constitutes trademark infringement or unfair competition. This is a question of law. On this record, the case is clearly an appropriate one for summary judgment. Rule 56(c), F.R.C.P., 28 U.S.C.A.
 
 
 26
 As a diversity case, state law is applicable on the issues of trademark infringement and unfair competition. Pecheur Lozenge Co. v. National Candy Co., 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103 (1942); Jewel Tea Co. v. Kraus, 7 Cir., 187 F.2d 278 (1950); Addressograph-Multigraph Corp. v. American Expansion Bolt & Mfg. Co., 7 Cir., 124 F.2d 706 (1941), cert. denied, 316 U.S. 682, 62 S.Ct. 1270, 86 L.Ed. 1755 (1942). Here, Indiana law is applicable.
 
 
 27
 The parties agree that the law of trademark infringement applicable to this case is identical with the applicable law of unfair competition. Trademark infringement is merely an aspect of unfair competition. Therefore, we may consider the common law trademark infringement and unfair competition issues together.
 
 
 28
 The Supreme and Appellate Courts of Indiana have held in a number of cases that the owner of a trademark or tradename is entitled to protection against the adoption and use by a competitor of the same or a similar mark or name. Smail v. Sanders, 118 Ind. 105, 20 N.E. 296 (1889); Keller v. B. F. Goodrich Co., 117 Ind. 556, 19 N.E. 196 (1888); Minas Furniture Co. v. Edward C. Minas Co., 96 Ind.App. 520, 165 N.E. 84 (1929); Jones v. Roshenberger, 82 Ind.App. 97, 144 N.E. 858 (1924); Hartzler v. Goshen Churn and Ladder Co., 55 Ind.App. 455, 104 N.E. 34 (1914); Computing Cheese Cutter Co. v. Dunn, 45 Ind.App. 20, 88 N.E. 93 (1909). The second user's adoption of the trademark or tradename in these cases suggested fraud. The second user's apparent purpose was to cause confusion concerning the source of its product, thereby capitalizing on the established reputation of the first user's product and diverting business from it.
 
 
 29
 In these and other cases the Indiana courts have formulated the rule that unfair competition is the attempt to create confusion concerning the source of the unfair competitor's goods. Rader v. Derby, 120 Ind.App. 202, 207, 89 N.E.2d 724 (1950); Minas Furniture Co. v. Edward C. Minas Co.,supra, 96 Ind.App. at 532-533, 165 N.E. 84; Jones v. Roshenberger, supra, 82 Ind.App. at 99-100, 144 N.E. 858; Hartzler v. Goshen Churn and Ladder Co.,supra, 55 Ind.App. at 464, 465-466, 104 N.E. 34; Deister Concentrator Co. v. Deister Machine Co., 63 Ind.App. 412, 420, 112 N.E. 906, 114 N.E. 485 (1916); Computing Cheese Cutter Co. v. Dunn, supra, 45 Ind.App. at 23-24, 88 N.E. 93. A typical formulation of the rule is contained in Hartzler:
 
 
 30
 'Unfair competition is always a question of fact. The question to be determined in every case is whether or not, as a matter of fact, the name or mark used by defendant has previously come to indicate and designate plaintiff's goods, or, to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business.' Hartzler v. Goshen Churn and Ladder Co., supra, 55 Ind.App. at 465-466, 104 N.E. at 38, quoting 38 Cyc. 779.
 
 
 31
 The Indiana Trade-Mark Act, Ind.Ann.Stat. 66-142 (Burns' 1961 Repl.), appears to adopt the same test for infringement of a state-registered trademark. It provides in part:
 
 
 32
 'Any person who shall
 
 
 33
 (a) use, without the consent of the registrant, any reproduction, counterfeit, copy or colorable imitation of a trade-mark registered under this act (66-130 to 66-145) in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source or origin of such goods or services; * * * shall be liable to a civil action by the owner of such registered trade-mark * * *.'
 
 
 34
 We are without the benefit of construction of this statute by the Indiana appellate courts.
 
 
 35
 The pleadings, depositions, answers to interrogatories, admissions of fact, and affidavits in this case clearly do not present a genuine factual question of confusion concerning the source of Ford's products. They reveal that Ford's MUSTANG was plainly identified as a Ford product in advertising and otherwise. Appellants produced no material admissible evidence of likelihood of confusion concerning the MUSTANG automobile.
 
 
 36
 Similarly, the pleadings, depositions, answers to interrogatories, admissions of fact, and affidavits do not raise a genuine issue of fact regarding likelihood of confusion about the source of Westward's products. Appellants produced slight evidence of actual confusion, and Ford apparently concedes the likelihood that Westward's MUSTANG-marked products will be mistaken for products of Ford.
 
 
 37
 Ford contends that under Indiana law and under federal law, if it is applicable, the second use of a trademark is not actionable if it merely creates a likelihood of confusion concerning the source of the first user's product. We are, therefore, called upon to decide whether, as a matter of Indiana law, the creation of such likelihood of confusion is actionable.
 
 
 38
 As we have indicated, the Indiana cases have involved the adoption and use of a mark or name identical with, or similar to, the established trademark or tradename of a competitor. The Indiana appellate courts have not considered whether a second use creating the likelihood of confusion about the source of the first user's products is actionable. The tests of unfair competition and trademark infringement formulated by the Indiana courts, as in Hartzler, do not embrace the latter type of confusion. Insofar as they appear to fix the boundaries of trademark infringement and unfair competition, they are mere dicta. Appellants apparently put forth a suggested doctrine of 'reverse confusion' concerning which we find no rational basis for support.
 
 
 39
 We conclude that the summary judgment entered by the district court should be affirmed on the ground that the evidence shows without contradiction that appellants' trademark rights do not extend to use of the mark on automobiles.
 
 
 40
 As stated by the district court, the word MUSTANG is not a unique or novel word, or one coined by appellants. It is a common noun. Prior to Westward's adoption of the word for its campers and travel trailers, it had been used on aircraft, automobile mufflers, automobile springs, automobile and truck brake linings, farm tractors, motorcycles, rebuilt automobile engines, storage batteries, hand trucks, truck engines, truck mountable cranes, and numerous other items. The name MUSTANG had been federally registered as a trademark thirty-four times, once for trailers and truck trailers. The latter registration was canceled by reason of abandonment, as a necessary, preliminary step in Westward's proceeding for registration of its trademark.
 
 
 41
 The law protects a trademark only if it is, or has become distinctive. 3 Callman, Unfair Competition and Trade-Marks 69 (2d ed.).
 
 
 42
 'In essence, the distinctiveness and popularity of the trade-mark will determine its relative strength or weakness and will accordingly define the scope of protection to be accorded the mark against the confusing similarity of others. A mark is strong if it is conspicuously distinctive; it is distinctive if the public has already been educated to accept it as the hallmark of a particular source. Then too, a mark can be distinctive either because it is unique, that is, distinctive in itself, because it has been the subject of wide and intensive advertisement, or because of a combination of both. It seems to follow as a necessary conclusion that the trade-mark has the advantage of strength where its owner has invested a considerable amount in advertising or can point to a long period of time during which his mark was used on a great quantity of articles, as symbolic of his business * * *. If the mark is weak, its protection may have an 'extremely narrow scope'; and may indeed be limited to similar goods similarly marketed. Only the strong mark will be protected against infringements arising out of its use in connection with noncompeting goods.' 3 Callman, Unfair Competition and Trade-Marks 82.1 at 1503-1504 (2d ed.). See also, Sunbeam Lighting Co. v. Sunbeam Corp., 9 Cir., 183 F.2d 969 (1950), cert. denied, 340 U.S. 920, 71 S.Ct. 357, 95 L.Ed. 665 (1951); Philco Corp. v. F. & B. Mfg. Co., 7 Cir., 170 F.2d 958 (1948), cert. denied, 336 U.S. 945, 69 S.Ct. 813, 93 L.Ed. 1102 (1949).
 
 
 43
 Appellants allege in their complaint that the name MUSTANG with the representation of a horse had been continuously and extensively used by Westward to designate its campers and trailers and that it had come to identify and distinguish those products to industry distributors and the general public. Ford countered these allegations with a substantial amount of evidence, most of it in the form of admissions of fact under Rule 36(a), F.R.C.P., 28 U.S.C.A.
 
 
 44
 Appellants admit that the name MUSTANG had been extensively registered and used as a trademark on a variety of products, some of them in the automotive field, prior to Westward's adoption of the mark. They state, in answer to Ford's interrogatories, that by the end of 1962, the year Ford introduced the experimental MUSTANG sports car, Westward had sold 253 MUSTANG campers and trailers and spent $28,400.69 in nationwide advertising of its MUSTANG products. They further state, in answer to Ford's interrogatories, that by April 1, 1964, shortly before Ford introduced its MUSTANG in the market, Westward had sold a total of 479 of its MUSTANG units and that by the end of 1964 it had expended a total of $93,761.49 for advertising. Finally, they admit that prior to 1965 Westward purchased and used on its campers and trailers the horse emblem used by White Motor Company to identify its MUSTANG truck engines.
 
 
 45
 In the period of 1960-65 Westward's sales of MUSTANG campers and trailers were less than one-tenth of one percent of total industry sales. During the first fifty-two months of production, through 1964, Westward's sales of campers and trailers were spread throughout twenty-eight states and reached or exceeded fifty units in only six states. In no state did its sales average as much as two units per month in this period.
 
 
 46
 The uncontradicted evidence introduced by Ford shows beyond controversy that Westward's MUSTANG mark was a weak mark. Ford's production of this evidence in support of its motion for summary judgment placed upon appellants the burden of raising a genuine issue of fact by producing evidence of their own. Markwell v. General Tire and Rubber Co., 7 Cir., 367 F.2d 748 (1966); Bradford v. School District No. 20, 4 Cir., 364 F.2d 185 (1966); Lundeen v. Cordner, 8 Cir., 356 F.2d 169 (1966). They could not rely on the mere allegations of their complaint to defeat summary judgment. Ibid.
 
 
 47
 Appellants did not carry the burden of raising a genuine issue concerning the strength of their mark. The district court correstly concluded that Westward's mark was a weak one.
 
 
 48
 The district court was also correct in its conclusion that Westward's trademark is limited to the trailer industry. It is undisputed that Westward's campers and trailers do not compete with Ford's MUSTANG sports cars. Nor was it likely that Westward's business would expand to include the manufacture of automobiles. Finally, while the products of the automotive industry are necessary to provide mobility for the products of the trailer industry, and while the marketing channels of the two industries overlap somewhat, we cannot say that campers and trailers and sports cars are 'similar goods similarly marketed.'
 
 
 49
 The pleadings, depositions, answers to interrogatories, and admissions of fact show that no genuine issue of material fact exists and that Ford was entitled to judgment as a matter of law.
 
 
 50
 There remains only the question whether the district court erred in denying the motion of appellants E. Edward and Bernice Enochs and Buelah Vaught to intervene.
 
 
 51
 Rule 24(a), F.R.C.P., 28 U.S.C.A., provides for intervention of right in certain cases if the application is timely filed. Here the application was filed sixteen months after the complaint was filed and one month after summary judgment was granted. Appellants seeking to intervene were intimately involved in the prosecution of this action from its inception. Under the circumstances, we find no error.
 
 
 52
 In sum, by virtue of the oral agreement of the parties, the trial court, in determining the question of summary judgment, was faced with a question of substantive law, absent any disputed question of material fact.
 
 
 53
 In our judgment, the record establishes that there is no likelihood of confusion of the origin of Ford's MUSTANG automobile; that Westward's trademark is limited to its use in the trailer industry; that Westward's mark is weak and its protection cannot be extended beyond the narrow limits of its established use.
 
 
 54
 The judgment of the district court is affirmed.
 
 
 55
 Affirmed.