Larry Esco **MIDDLEBROOKS**, Plaintiff,

v.

The **CURTIS PUBLISHING COMPANY**,
Defendant.

Civ. A. No. 8368.

United States District Court
D. South Carolina,
Florence Division.

Feb. 29, 1968.

See, also, D.C., 264 F.Supp. 373.

James P. Mozingo, III, Darlington, S. C., John C. West, Camden, S. C., for plaintiff.

Carlisle Roberts, Roberts, Jennings & Thomas, Columbia, S. C., for defendant.

## ORDER

SIMONS, District Judge.

This action for libel and invasion of privacy was commenced by plaintiff Larry Esco Middlebrooks in the Court of Common Pleas for Darlington County, South Carolina, against defendant The Curtis Publishing Company, as a result of defendant's publication of a short story entitled "Moonshine Light, Moonshine Bright" in its March 16, 1963 issue of The Saturday Evening Post. The action was removed to this court by defendant.

Plaintiff's complaint in his first cause of action alleges that defendant published the article entitled "Moonshine Light, Moonshine Bright" written by William Price Fox, purporting to be fiction which involved various illegal activities of two teenage characters, Esco Brooks and Earl Edge, in and about Columbia, South Carolina during the early years of World War II when rationing was in effect. Plaintiff further contends that the character, "Esco Brooks", was identified by the public as plaintiff Larry Esco Middlebrooks, especially in view of the locale of the story and the use of names of several actual living persons who had a connection with plaintiff when he lived in Columbia during his teenage years. Plaintiff's complaint sets out in detail those portions of the story alleged to be false,

malicious and libelous, and which charge him with being dishonest, a liar, a thief, and a person of poor credit. As a result thereof plaintiff claims damage to his reputation, embarrassment, humiliation, mental anguish, and further alleges that he has lost, and will continue to lose, wages and promotions in his employment, and demands One Million Dollars in actual and punitive damages.

The complaint in the second cause of action alleges that defendant's publication of "Moonshine Light, Moonshine Bright" constituted an unwarranted invasion of his right of privacy, which resulted in embarrassment, humiliation and mental anguish; that defendant knew or should have known that such damages would result by reason thereof, and demands One Million Dollars in actual and punitive damages upon his second cause of action.

Defendant in its answer generally denies the allegations of plaintiff's complaint as to both causes of action.

Defendant further asserts that "Moonshine Light, Moonshine Bright" was a fictional story as it was clearly identified in the Post; that it was not of and concerning plaintiff, and that no one could reasonably connect plaintiff with the obviously fictional character in the story; that it was published in good faith as a work of fiction and not fact; and that neither the author nor defendant intended to depict plaintiff as the Esco Brooks in the highly contrived and imaginative tale. Defendant further contends that plaintiff had previously consented to the use of his name, and that under all the circumstances he is estopped to complain about the references to Esco Brooks.

The case was tried by the court without a jury on November 1 and 2, 1967 at Florence, South Carolina. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff is a resident of the State of South Carolina. Defendant is incorporated and has its principal place of business in some state other than the State of South Carolina. The amount in controversy, exclusive of interest and costs exceeds the sum of Ten Thousand Dollars.

2. Defendant publishes The Saturday Evening Post and in the Post of March 16, 1963, it published a story entitled "Moonshine Light, Moonshine Bright", written by William Price Fox.

3. "Moonshine Light, Moonshine Bright" is a work of fiction, so designated in the issue of the Post in which the story appeared; the characters, incidents and events described in this story were intended by the author and understood by defendant, the publisher, to be fictitious, said work being a humorous account of two teenage boys holding summer jobs in Columbia, South Carolina during World War II, whose desperate concern is to get money to keep an old car running.

4. The story as published contained the names of actual streets and locations in Columbia, South Carolina, and of several actual living persons who lived there at the time of the setting for the story such as Church Moore, Sam Jones, and Doug Broome.

5. Plaintiff, Larry Esco Middlebrooks, was reared in the City of Columbia, where he lived with his family on Elmwood Street until the time of his graduation from high school in 1943.

6. The author, William Price Fox, was reared in the City of Columbia, where he resided with his family during the late 1930's and the early years of World War II. He was a close teenage friend of plaintiff, and was well acquainted with other members of plaintiff's family.

7. During the years of his youth plaintiff was known as "Esco Middlebrooks", as well as "Larry" and "Preacher", to the members of his family and friends, including the author, William Price Fox. After moving from Columbia, plaintiff has been generally known among his friends and associates as "Larry" or "Lawrence" Middlebrooks.

8. In August 1962, William Price Fox published in book form a collection of fictional short stories entitled "Southern Fried". One of the fictional characters in some of the short stories was Esco Middlebrooks. Plaintiff expressed to Fox his approbation and approval of "Southern Fried" on several occasions in conversations and in two handwritten postcards mailed from Bennettsville and Columbia, South Carolina to "Bill Fox, 250 Park Ave., New York, N. Y."[1] This book sold between 250,000 and 400,000 copies. Defendant herein had no connection with that publication.

During plaintiff's direct examination and on cross-examination, he testified that he had been highly displeased, unhappy, and embarrassed about the use of his name by Fox in "Southern Fried", and that he had in fact seriously contemplated legal action against Fox in connection with such publication. He further denied vehemently that he had ever given any approbation, or had wished Fox success with it or with future books. The two postcards from plaintiff to Fox (Def.'s Exs. "C" and "D"—Note 1 supra) which he admitted writing contradict and impeach such testimony completely, and tend to cast considerable doubt upon plaintiff's entire testimony.

9. Prior to publication of "Southern Fried", Fox had told plaintiff during a visit to his home that he was writing and hoped to publish some "pretty wild" stories about "the old drug store gang" and his name would be used, to which plaintiff agreed.

10. Fox wrote the story "Moonshine Light, Moonshine Bright", sold it to The Saturday Evening Post, and it was published in the March 16, 1963, issue of the Post. This story was originally written by Fox for inclusion with the other short stories in "Southern Fried", but was held for separate publication because of its length. The Post story is of the same general type as those in "Southern Fried", and the fictional character Esco Brooks is pictured in much the same vein as was the Esco Middlebrooks of "Southern Fried."

Jeff Brown, fiction editor of the Post, purchased "Moonshine Light, Moonshine Bright" from Fox through the latter's literary agent in January 1963, unaware that any of the characters bore the names of real persons.

11. Some time about February 10, 1963, Fox made a telephone call from his office in New York City to plaintiff's home in Bennettsville, South Carolina. As plaintiff was not home at the time Fox spoke to his wife.

12. The contents of this conversation are in dispute in the evidence. Plaintiff's wife testified that Fox told her that he had a story coming out in the Post and requested that plaintiff send him a tele-

---

1. Defendant's Exhibit "D", card postmarked "Bennettsville, S. C., Oct. 10, 1962, 9 AM" which reads as follows:
"Hi Bill!
"We all got many laughs out of your book. Hope it has much success as well as future books, etc. Glad Truluck is in position to help. We've really been busy here, working 6 days every week.
"I can get a few days off and would love to go to game. Come by here and spend the night and we could go to Columbia together. I tried to call you 3 or 4 times, no luck. The game is at Clemson Nov. 24. Try to get some tickets. If you take your wife get one for mine. Drop me another card to let me know when you're coming. Maybe you could spend the night here and we could play some golf the next day before going to Columbia. I haven't played in two years. Like to watch 'Pro' Football on on Sundays.
"Write soon.
Esco M."
Defendant's Exhibit "C", card postmarked "Columbia, S. C. Oct. 30, 1962, 3:30 PM" which reads as follows:
"Hi Bill,
"Good to hear from you. I'm in Columbia now taking a 3 wk school course. Glad to hear of the success of the book. Hope this new one does even better. I've tried to call you 3 or 4 times, no ans. I'd love to see the Vir. game, but don't know if boss lady will let me stay in Cola. (without fight) we'll see. Come on down and give me a buzz at Dads. Hope all are well.
"Esco"

gram granting permission to use his name in the story. Fox denied that he said anything about plaintiff sending him a telegram or giving him permission to use plaintiff's name; that he already had permission to use plaintiff's name, and that the telephone call came about through his excitement at the approaching publication of his first story in a leading magazine and his desire to share the good news with his best friend. He further testified that he told plaintiff's wife that the story would appear in the March 16, 1963, issue of the Post; that plaintiff's name would be in it, and for him to look for it. I find Fox's version of the conversation the more credible.

On February 11, 1963, plaintiff sent Fox the following collect telegram: "Do not use my name in any other books or stories. No hard feelings. Esco"

13. Upon receipt of this telegram, Fox showed the same to defendant's fiction editor Jeff Brown. For the first time he told Brown that one of the characters in his story, Esco Middlebrooks, was the name of a real person, one of his best friends who lived in South Carolina; and that Middlebrooks, whose full name was Larry Esco Middlebrooks, had not objected to the use of Esco Middlebrooks in "Southern Fried"; that on the contrary he had approved of it in that book, and of its subsequent use in his new book, but that he was now asking that his name not be used "in any other books or stories," in order, Fox told Brown, "to get his wife off his [the friend's] back." Brown and Fox then decided to change the name of the fictional character to Esco Brooks, and wrote plaintiff immediately advising that "I changed your name to Brooks in the Sat. Evening Post story that is coming out in March."[2]

14. This letter from Fox to plaintiff was mailed on February 12, 1963, and was received in due course, more than a month before the publication date of the issue of the Post complained of.

15. At the time plaintiff's telegram was called to the attention of Jeff Brown, Senior Editor of the Post, plaintiff's entire name could have been stricken from the publication with very little mechanical inconvenience and at relatively minor expense to defendant.

16. Brown and Fox desired to retain the name "Esco" in the publication because they liked the name which had a pleasing sound and was unusual. Since plaintiff did not respond to Fox's letter advising that the name was being changed from Esco Middlebrooks to Esco Brooks, Brown was led to believe reasonably that the proposed change was satisfactory and not objectionable to plaintiff.

17. The central theme of the story "Moonshine Light, Moonshine Bright" was the theft of certain quantities of butter from a local dairy in the City of Columbia, South Carolina, which was admittedly committed by the author Fox during his teenage years when he was employed at the dairy. Plaintiff in actuality had nothing to do with such theft. However, in the story "Moonshine Light, Moonshine Bright" the theft of the butter was attributed to the characters "Esco Brooks", and "Earl Edge", who also stole other items such as gasoline.

18. The story as published describes the character "Esco Brooks" as having committed acts indictable as crimes under the laws of South Carolina and the United States. It also describes "Esco Brooks" as an irresponsible, undependable, and dishonest person who enjoys poor credit, and is a "very fast liar".

19. Defendant, through its officer, agent, servant, and employee Jeff Brown, acting within the course and scope of his employment, knew that plaintiff, Larry Esco Middlebrooks, was a living, actual person, prior to its publication of March 16, 1963. It had been further advised that plaintiff objected to the use of

---

2. Plaintiff's Exhibit 3, letter from Fox to plaintiff mailed from New York, N. Y. to

"Lawrence E. Middlebrooks, Bennettsville, S. C." postmarked at 5 PM Feb. 12, 1963.

his name by Fox in any other books or stories.

20. Even though fictional, the story "Moonshine Light, Moonshine Bright" was defamatory, libelous and malicious as to the character "Esco Brooks" in the particulars alleged in the complaint and would also constitute an invasion of the privacy of such fictional character, persons reading the story could not conclude reasonably under the circumstances that the "Esco Brooks" depicted therein was in fact, or was intended to be, plaintiff. Plaintiff's witnesses who testified in his behalf at the trial stated that they did not believe that plaintiff had ever engaged in such escapades as were recounted in the story, or that he possessed the bad and undesirable traits attributable to "Esco Brooks". As a matter of fact none of the events which were pictured as happening in this fictional story ever in reality happened to plaintiff. This was well known not only to the author Fox, one of plaintiff's best friends, but also to plaintiff's witnesses who knew him during his childhood. The primary reason the story was set in Columbia was because the author had grown up there, and he stated that the reason he used the name "Esco" was because he liked its sound. The story does not parallel plaintiff's boyhood life in Columbia in any significant manner. Aside from the fact that the story was labeled fiction in the Post, even a hurried examination reveals that it is highly fictionalized. It is illustrated in the magazine by means of caricatures and not photographs, as is the custom when dealing with a true article. In the story "Esco Brooks" was about fifteen years of age at the time of the setting in 1944 or 1945, while plaintiff who was born in 1924 was twenty to twenty-one years of age at that time and he had left Columbia in June 1943 to join the Navy. Plaintiff admitted that he and his family lived in the Elmwood section of Columbia, while "Esco Brooks" in the story lived up beyond the top of the Devine Street Hill in an entirely different section of town. Further, most of the activities detailed in the story centered around a dairy where "Esco Brooks" was employed, while in fact plaintiff never worked at any dairy. Thus, the differences between the real Larry Esco Middlebrooks, plaintiff, and the fictional "Esco Brooks" far outweigh the few inconclusive similarities that may be found to exist and no reader would have been able to conclude on any reasonable basis that the fictional character was in fact the plaintiff or intended to be him.

21. Defendant's publication of "Moonshine Light, Moonshine Bright" was without any malice to any real or living person, including plaintiff. No one at the Post was acquainted personally with plaintiff, or even knew that he was a real person except the fictional editor, Jeff Brown, who learned of his existence after Fox showed him plaintiff's telegram. In compliance with plaintiff's request and after conferring with Fox defendant changed the hero of the story from "Esco Middlebrooks to "Esco Brooks", and Fox advised plaintiff of this change at least a month before publication date and plaintiff never replied to this letter or protested in any manner about the use of the name "Esco Brooks". Under the circumstances defendant was justified in assuming that this change was completely agreeable to plaintiff, and is adequate proof of defendant's contention that it acted in complete good faith and without malice.

22. The record is devoid of any testimony that plaintiff has suffered any financial loss as a result of the publication of this story, or that he could reasonably be expected to suffer such loss in the future. To the contrary the evidence establishes that he has continued to make progress and earn promotions with his employer, Southern Bell Telephone and Telegraph Company, which are accompanied by more responsibilities and increased earnings.

23. All of plaintiff's witnesses testified that he enjoyed an excellent reputation in the communities where he has lived and where he still resides, and there

is no indication that his fine reputation or standing in the community has been impaired in any manner by the publication. Neither is there any showing from the evidence that his right to privacy has been improperly invaded by the publication of this fictional story.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the subject matter of this action.[3]

2. The substantive law of the State of South Carolina governs the issues in this case.

3. South Carolina law authorizes an action for libel which is defined as " * * * a malicious publication, expressed either in printing or in writing, or by signs or pictures, tending either to blacken the memory of one dead, or the reputation of one who is alive, and expose him to public hatred, contempt, or ridicule." Riley v. Askin & Marine Co., 134 S.C. 198, 132 S.E. 584, 585, 46 A.L.R. 558 (1926).

4. A written publication imputing to another an indictable crime is libelous *per se,* and the publication of words which are actionable *per se* gives rise to a presumption of malice on the part of the publisher. The South Carolina Supreme Court, in its recent decision of Jones v. Garner and the Sun-News, 158 S.E.2d 909, filed January 9, 1968, in speaking of malice and the right to recovery of punitive damages as a result thereof, stated as follows:

"Malice, in actions for libel or slander, is of two kinds: implied malice or malice in law, and actual malice or malice in fact.

" 'Malice in law, or legal malice, is a presumption of law and dispenses with the proof of malice when words which raise such presumption are shown to have been uttered. This form of malice is not necessarily inconsistent with an honest or even laudable purpose and does not imply ill will, personal malice, hatred, or a purpose to injure.' 33 Am. Jur., Libel and Slander, Section 111. Also, 53 C.J.S. Libel and Slander § 2.

"While implied malice will support an award of actual damages, punitive damages cannot be recovered in the absence of proof of actual malice.

"Actual malice or malice in fact is not presumed and must be proved. Actual malice means that the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious indifference toward plaintiff's rights. See: Rogers v. Florence Printing Co., 233 S.C. 567, 106 S.E. 2d 258."

In the proof of actual malice it is not necessary to establish ill will or malignity since such malice may arise from a gross disregard of the rights of the person injured. Fulton v. Atlantic C. L. R. Co., 220 S.C. 287, 67 S.E.2d 425 (1951).

5. From the foregoing authorities it is clear that if defendant's published story was actually written about plaintiff, or the fictional character "Esco Brooks" could have been reasonably recognized or identified as representing plaintiff in the story, then plaintiff would as a matter of law be entitled to an award for actual damages as a result of the libel. However, it would still be incumbent upon him to prove actual malice on defendant's part before he would be entitled to punitive damages. In order to recover punitive damages plaintiff must establish, not only that the story was libelous of him, but also that defendant was motivated by ill will and with a design to causelessly and wantonly injure plaintiff, or that the story was published with such recklessness as to show a conscious disregard of his rights.

6. From the foregoing findings of fact, the court must conclude that plaintiff is not entitled to recover actual

3. See Middlebrooks v. Curtis Publishing Company, 264 F.Supp. 373 (D.S.C.1967).

or punitive damages, inasmuch as the published story was fictional and no one could reasonably conclude that the fictional character "Esco Brooks" was one and the same person as plaintiff, or that he was reasonably identifiable as such. Neither is there any showing that such character was intended by the author or by defendant to be identified as, or to portray, plaintiff.

7. Even if the published story were found to be libelous of plaintiff, he would only be entitled to an award of actual damages, since defendant has overcome any presumption of actual malice on its part, and the court concludes that the story was published by defendant in complete good faith under the circumstances. It is further concluded that plaintiff has failed to carry his burden of proof to establish any special damages resulting to him from such publication. Thus, if he were entitled to an award for actual damages such would be limited to a nominal sum.

8. South Carolina also recognizes an independent and distinct cause of action in tort for one whose right of privacy has been wrongfully invaded. Malice is not an essential element of such cause of action; neither is truth a defense to such action. In Meetze v. Associated Press, 230 S.C. 330, 95 S.E. 2d 606 (1956) the South Carolina Supreme Court defined what constitutes an actionable invasion of the right of privacy as follows:

> " 'The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.' "

However, the establishment of malice in connection with the wrongful invasion of one's privacy entitles such person to recover punitive damages in addition to his actual damages.

9. Based upon the foregoing findings and conclusions in reference to the publication of this fictional story, the court further concludes that plaintiff has failed to make out his case for wrongful invasion of his privacy by the published story, and is not entitled to recover actual or punitive damages on such cause of action.

Let judgment be entered for defendant on both causes of action.

And it is so ordered.