**T.J. HOOKER, Plaintiff,**

v.

**COLUMBIA PICTURES INDUSTRIES, INC., a corporation, Spelling-Goldberg Productions, a partnership or a corporation, and American Broadcasting Companies, Inc., a corporation, Defendants.**

No. 82 C 2074.

United States District Court,
N.D. Illinois, E.D.

Dec. 6, 1982.

Robert M. Newbury, Mark V.B. Partridge, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., for plaintiff, T.J. Hooker.

Lawrence Gunnels, James H. Alesia, Charles J. Sennet, Reuben & Proctor, Chicago, Ill., defendants, Columbia Pictures Industries, Inc. and Spelling-Goldberg Productions.

Anton R. Valukas, Carol R. Thigpen, Gail A. Niemann, C. John Koch, Jenner & Block, Chicago, Ill., for defendant, American Broadcasting Companies, Inc.

## MEMORANDUM OPINION

KOCORAS, District Judge:

Plaintiff is a professional woodcarver from Woodstock, Illinois. Examining the host of exhibits appended to the affidavit which he has submitted, it appears that while plaintiff does carve other birds, he specializes in ducks. Plaintiff's ducks are of the highest quality. Some of them are described as "exquisite" and sell for a great deal of money. Plaintiff's Affidavit, Exhibits 1, 4. Plaintiff's name is T.J. Hooker. He runs a business by the same name producing ducks and other wooden creatures. Among aficianados of such art, plaintiff and his ducks are "internationally renowned." *Id.*, Exhibit 2 at 3, Exhibit 3.

Plaintiff has garnered such wide acclaim by dint of his fine workmanship and his extensive promotion and marketing. Each year, plaintiff sells "many hundreds of thousands of dollars worth of wildlife art identified by his name." Complaint ¶ 10.

The defendants are Columbia Pictures Industries, Inc.; Spelling-Goldberg Productions; and American Broadcasting Companies, Inc. These companies produce and broadcast a television series about a fictional policeman in California. Never having heard of plaintiff or his celebrated ducks, the defendants happened to name their imaginary policeman "T.J. Hooker." Not surprisingly, the series is also entitled "T.J. Hooker." Plaintiff admits that this choice of a name for the character and series "may be a mere coincidence." Plaintiff's Memorandum in Support of Motion for Preliminary Injunction at 7. However, plaintiff thinks that he nevertheless has been wronged, and he brings this action seeking to vindicate his rights. The lawsuit revolves around the use of the name "T.J. Hooker." The central theme in all four counts of plaintiff's complaint is that "T.J. Hooker" is his name and the defendants cannot use it without his permission.

Plaintiff grounds his claims for relief on four theories. The defendants contend that plaintiff has failed to state a claim under any of these theories. Accordingly, they have moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6). Plaintiff, in turn, has moved for a preliminary injunction under Fed.R.Civ.P. 65, seeking to enjoin the defendants from advertising or broadcasting their show using the name "T.J. Hooker." As might be expected, the defendants vigorously oppose this motion.

### A.

■ Count I of the complaint is based upon the common law tort of appropriation of the plaintiff's name or likeness for the defendants' benefit or advantage. In order to state a claim for relief based on this theory, it is vital that some "appropriation" be alleged. *See* W. Prosser, *Law of Torts* § 117 at 804–07 (4th ed. 1971). "Appropria-

tion" in this context means more than the mere coincidental use of a name that happens to be the same as that of the plaintiff. Dean Prosser explained this as follows:

> It is the plaintiff's name as a symbol of his identity that is involved here, and not as a mere name. Unless there is some tortious use made of it, there is no such thing as an exclusive right to the use of a name; and any one can be given or assume any name he likes. It is only when he makes use of the name to pirate the plaintiff's identity for some advantage of his own, as by impersonation to obtain credit or secret information, or by posing as the plaintiff's wife, or providing a father for a child on a birth certificate, that he becomes liable. It is in this sense that "appropriation" must be understood. It is therefore not enough that a name which is the same as the plaintiff's is used in a novel, or the title of a corporation, unless the context or the circumstances indicate that the name is that of the plaintiff.... Nor is there any liability when the plaintiff's character, occupation, and the general outline of his career, with many real incidents in his life, are used as the basis for a figure in a novel who is still clearly a fictional one.

*Id.* at 805–06 (footnotes omitted).

Similarly, the Restatement of Torts makes it clear that it is not the use of the plaintiff's name which constitutes a tort but rather the appropriation of the value of his name and reputation:

> It is not enough that the defendant has adopted for himself a name that is the same as that of the plaintiff, so long as he does not pass himself off as the plaintiff or otherwise seek to obtain for himself the values or benefits of the plaintiff's name or identity. Unless there is such an appropriation, the defendant is free to call himself by any name he likes, whether there is only one person or a thousand others of the same name. *Until the value of the name has in some way been appropriated, there is no tort.*

Restatement (Second) of Torts § 652C, comment c (1976) (emphasis added).

■ Examining Count I in light of the foregoing principles, it is apparent that plaintiff has failed to allege a tortious appropriation of his name. Plaintiff does allege that "[d]efendants' ... use of plaintiff's name appropriates the right of publicity in plaintiff's celebrated name." Complaint ¶ 22. But this broad, conclusory allegation cannot substitute for allegations of facts showing that the defendants used the name "T.J. Hooker" as a means of pirating plaintiff's identity. By his own admission, the commercial value of plaintiff's name is in the field of wildlife art. Complaint ¶¶ 9–12. Hunters, sportsmen, and collectors identify plaintiff's name with fine carvings of ducks and other fowl. There is nothing in the complaint which can be construed as an allegation that the defendants adopted the name "T.J. Hooker" in order to avail themselves of plaintiff's reputation as an extraordinary woodcarver.

Plaintiff admits that the fictional television series at issue here is a "police drama." Complaint ¶ 17. It is difficult to imagine a subject further removed for the life of T.J. Hooker the artisan. The facts and circumstances alleged by plaintiff provide no basis upon which it can be found that the name "T.J. Hooker," as used in the defendants' fictional television series, in any way refers to the real T.J. Hooker.

There being no well-pleaded allegation of appropriation of the value of plaintiff's name, plaintiff has failed to state a claim upon which relief can be granted. Accordingly, the motion to dismiss is granted as to Count I.

### B.

Count II appears to be predicated on a different branch of the so-called "right of privacy." In Count II, plaintiff repeats the allegations of Count I and concludes that these allegations state a claim for invasion of his privacy. It is not clear exactly what plaintiff's theory is in this count, but it appears that he may be seeking relief for what Dean Prosser calls the tort of placing a person "in a false light in the public eye." Prosser, *supra,* at 812. For example, plain-

tiff states, "[U]se of the name T.J. Hooker in connection with defendants' television program will affect adversely the reputation of plaintiff T.J. Hooker with all who might associate him with the program and its promotion." Plaintiff's Memorandum in Support of Motion for Preliminary Injunction at 12. Similarly, plaintiff also declares, "Defendants are using [plaintiff's] name for a police program. Association with a television police program is offensive to plaintiff and his reputation as an artist. As a result, he has suffered pecuniary and other damage to his reputation." Plaintiff's Memorandum in Opposition to Motion to Dismiss at 11.

As in Count I, the foundation of plaintiff's claim in this count is the fact that the fictional character in the television series happens to have the same name as plaintiff. Plaintiff apparently reasons that the violent behavior of the fictional T.J. Hooker will be ascribed to the real T.J. Hooker, whose only violence, if it can be called that, consists of applying his knife to inanimate blocks of wood as he transforms them into wonderfully lifelike birds. Under this logic, every violent deed committed by the chimerical California lawman is the functional equivalent of a public declaration that T.J. Hooker the Illinois woodcarver is actually a man whose violent propensities belie the image of bucolic serenity he cultivates.

This reasoning is unsound. Plaintiff has not alleged an identity between himself and the fictional character in the show sufficient to permit such conclusions. As plaintiff readily admits, the show is a "drama," an adventure story depicting the television industry's conception of police work. No reasonable person viewing such a show would understand it to be a commentary on the life of an internationally acclaimed wildlife artist named T.J. Hooker. There exists a fundamental dichotomy in the identities of the fictional character and the real person which is not dispelled by the mere happenstance of their possessing the same name.

The weight of authority supports this conclusion. *Middlebrooks v. Curtis Publishing Co.,* 413 F.2d 141 (4th Cir.1969), is but one of many cases which illustrate the principles involved. In *Middlebrooks,* an author who had grown up with a boy named Larry Esco Middlebrooks had written a book featuring a character by the name of "Esco Middlebrooks." In the book, the fictional character engaged in conduct which the Fourth Circuit Court of Appeals later described as "censurable." The same author later wrote a magazine story in a similar vein. When the real Larry Esco Middlebrooks learned that the author proposed once again to use the name "Esco Middlebrooks," this time as the name of the leading character in the magazine story, he objected. The author went ahead with the article, but he changed the character's name from "Esco Middlebrooks" to "Esco Brooks." After the article was published, Larry Esco Middlebrooks brought suit, alleging that he had suffered impairment of his reputation and subjection to ridicule, as well as lost wages and promotions in his employment.

The district court entered judgment for the defendant publisher, stating:

> [T]he published story was fictional and no one could reasonably conclude that the fictional character "Esco Brooks" was one and the same person as plaintiff, or that he was reasonably identifiable as such. Neither is there any showing that such character was intended by the author or by defendant to be identified as, or to portray, plaintiff.

281 F.Supp. 1, 8 (D.S.C.1968). The Fourth Circuit Court of Appeals affirmed, concluding that the district court's finding of no reasonable identification between the plaintiff and the fictional character was supported by the "marked dissimilarities between the fictional character and the plaintiff." 413 F.2d at 143.

*Middlebrooks,* of course, was decided after the district court had heard evidence on the plaintiff's allegations. However, despite the difference in the procedural posture of the instant case, the legal principles are readily transferable. T.J. Hooker has alleged nothing to show that the "T.J.

Hooker" police show is or was intended to be a nonfictional account of his activities as a woodcraftsman. Indeed, the opposite is true. Plaintiff Hooker acknowledges the enormous dissimilarities between himself and the fictional police character. On their face, it is obvious that the allegations which plaintiff does make in Count II are wholly insufficient, under any set of facts he could prove, to support a finding of a reasonable identification between plaintiff and the fictional character bearing the same name.

Accordingly, the motion to dismiss Count II is granted.

### C.

Count III of the complaint is grounded on an alleged violation of the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, § 311 et seq. In support of his claim under this statute, plaintiff repeats the allegations of Count I and adds the conclusory allegation that defendants' "use of plaintiff's name T.J. HOOKER is likely to cause confusion or misunderstanding as to the sponsorship, affiliation, connection or association of plaintiff with defendants' program." Complaint ¶ 28.

■ The Illinois Deceptive Trade Practices Act provides in pertinent part:

A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

. . . .

(2) causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(3) causes likelihood of confusion or misunderstanding as to affiliation, connection or association with or certification by another;

. . . .

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding . . . .

Ill.Rev.Stat. ch. 121½, § 312. Essential to the maintenance of an action under this statute are well-pleaded allegations indicating the existence of a "likelihood of confusion." See National Conference of Bar Examiners v. Multistate Legal Studies, Inc., 212 U.S.P.Q. 673, 678 (N.D.Ill.1981). Plaintiff's allegation in paragraph 28 of the complaint initially appears to meet this requirement, since it parrots the statutory language. But, upon a closer examination, it is clear that paragraph 28 is actually nothing more than a sweeping legal conclusion cast in the form of a factual allegation. See Wright & Miller, Federal Practice and Procedure: Civil § 1357 at 596. As such, this paragraph is not accepted as true, see, e.g., Frederiksen v. Poloway, 637 F.2d 1147, 1150 n. 1 (7th Cir.1980), cert. denied, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); Watters v. Harris, 656 F.2d 234, 240 (7th Cir.1980); Mitchell v. Archibald & Kendall, Inc., 573 F.2d 429, 432 (7th Cir.1978), and it is necessary to examine the other allegations in the count, which will be accepted as true, to see if they adequately allege the requisite "likelihood of confusion."

■ "Likelihood of confusion" has the same meaning in unfair competition cases under the Deceptive Trade Practices Act as it has in trademark infringement cases. See, e.g., Scott v. Mego International, Inc., 519 F.Supp. 1118, 1136–37 (D.Minn.1981). "Likelihood of confusion" exists when the defendant's use of a deceptive trade name, trademark, or other distinctive symbol is likely to confuse or mislead consumers as to the source or origin of the product or service. See J. Gilson, Trademark Protection and Practice, § 5.01 (1982). The standard requires only that a seller identify his product or service in such a manner that " 'purchasers exercising ordinary care to discover whose products they are buying will know the truth and not become confused or mistaken.' " Dave Grossman Designs, Inc. v. Bortin, 177 U.S.P.Q. 627, 630 (N.D.Ill.1973); Cameo, Inc. v. Plough, Inc., 185 U.S.P.Q. 228, 230 (N.D.Ohio 1975). There must be "a likelihood, and not a mere possibility, of confusion." Instrumentalist Co. v. Marine Corps League, 509 F.Supp. 323, 331 (N.D.Ill. 1981) (emphasis in original). See Kirkland v. National Broadcasting Co., 425 F.Supp.

1111, 1115 (E.D.Pa.1976), *aff'd without opinion,* 565 F.2d 152 (3d Cir.1977).

■ Examining the allegations of Count III in light of the technical meaning of the term "likelihood of confusion," it becomes clear that those allegations are insufficient to state a claim under the Illinois Deceptive Trade Practices Act. Even accepting the truth of plaintiff's allegation that "[defendants'] use of the name T.J. HOOKER will attract the attention of that large segment of the population familiar with plaintiff's name and reputation to defendants' program," Complaint ¶ 20, this cannot be construed as the sort of marketplace confusion contemplated by the drafters of the Act. Plaintiff has alleged absolutely nothing to indicate either that consumers of his products will be confused as to his affiliation with the defendants' police drama or that viewers of the program will be confused as to the show's affiliation with T.J. Hooker's woodcarving enterprise.

Accordingly, the motion to dismiss is granted as to Count III.

### D.

Count IV of plaintiff's complaint asserts a claim based upon section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). This federal trademark statute provides in pertinent part:

> Any person who shall affix ... or use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation.

In making this claim, plaintiff once again repeats the basic allegations of Count I. He then repeats the conclusory allegation contained in paragraph 28 of Count III, which was rejected in the discussion above. Plaintiff concludes by alleging a similarly broad legal conclusion: "Defendants' afore-said use of plaintiff's name T.J. HOOKER constitutes a false representation in violation of [the statutory provision quoted above]." Complaint ¶ 32.

■ As with a claim under the Deceptive Trade Practices Act, it is fundamental to a claim under section 43(a) of the Lanham Act that a plaintiff make well-pleaded allegations indicating that the defendant has created a "likelihood of confusion" as to the origin of its products. *See, e.g., International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir.1980).

This requirement was discussed by the Court of Appeals for the Ninth Circuit in *Toho Co., Ltd. v. Sears, Roebuck & Co.,* 645 F.2d 788 (9th Cir.1981). In that case, Toho, a Japanese corporation which owned the rights to the fictional reptilian monster "Godzilla" sued the American retailer for what Toho alleged was an improper use by Sears of a likeness of "Godzilla." Toho and its licensees produced and distributed movies and other products featuring "Godzilla" and used the monster's picture, as well as the slogan "King of the Monsters," to promote these products. Sears produced and sold plastic garbage bags in boxes which displayed the word "Bagzilla" along with a humorous picture of a reptilian creature and the legend "Monstrously Strong Bags."

In affirming the district court's dismissal of Toho's complaint for failure to state a claim, the Ninth Circuit concluded that "Toho ha[d] not alleged facts that would permit a conclusion that consumers are likely to be confused as to source or sponsorship of the garbage bags." 645 F.2d at 791. The court considered several factors in reaching this conclusion. However, the most influential of those factors was the sharp difference in the nature of the products involved, the court holding that "[t]he goods are unrelated as a matter of law." *Id.*

■ While there are certain factual differences between *Toho* and the instant case, there are also strong analogies, and the *Toho* reasoning is fully applicable to plaintiff's allegations in Count IV. As in *Toho,*

plaintiff does not allege that the goods he produces are in any way related to the television "product" produced by the defendants. Plaintiff cannot in good faith make such an allegation. His complaint acknowledges the distinct nature of the two products. They are, as in *Toho,* "unrelated as a matter of law." Moreover, as in the *Toho* case, the channels through which the products are marketed appear, from plaintiff's own allegations, to be entirely different. Plaintiff sells his goods through speciality catalogs and gift shops. The defendants, on the other hand, "market" their show on a nationwide television network, making it available to every television viewer in the country. Furthermore, the Ninth Circuit stated in *Toho* that "[i]n order to raise the inference of a likelihood of confusion, a plaintiff must show that the defendant intended to profit *by confusing consumers.*" *Id.* at 791 n. 2 (emphasis in original). Nothing in plaintiff's complaint can fairly be read as an allegation that these defendants had such an intent.

The conclusion is therefore inescapable that plaintiff has, like the plaintiff in *Toho,* failed to allege facts that would permit a conclusion that consumers are likely to be confused as to the source or sponsorship of the television show "T.J. Hooker."

Accordingly, the defendants' motion to dismiss is granted as to Count IV.

### E.

For the foregoing reasons, the motion of the defendants to dismiss the complaint in its entirety pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim is granted. And, in accordance with this decision to dismiss the complaint, the plaintiff's motion for a preliminary injunction based upon Counts I and II of the complaint is denied.