**M–F–G CORPORATION, an Illinois corporation, Plaintiff,**

**v.**

**EMRA CORPORATION, a California corporation, Dion, Inc., a California corporation, Robert Parsons and Julie Parsons, as individuals, Defendants.**

No. 84 C 10846.

United States District Court, N.D. Illinois, E.D.

Dec. 12, 1985.

Jerome F. Fallon, John W. Chestnut, Tilton, Fallon, Lungmus & Chestnut, Chicago, Ill., for plaintiff.

William Van Santen, John Mortimer, Chicago, Ill., Bruce W. Schwab, George Schwab, Townsend & Townsend, San Francisco, Cal., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

### FACTS

Plaintiff M–F–G Corporation ("MFG") is an Illinois corporation in the business of selling beauty and barber supplies primarily to the hair care industry. MFG sells a wide variety of products (approximately 1,500 items according to its 1984 10–K report to the SEC) through intermediaries such as barber supply houses and cosmetology and barber schools. Certain hair cutting scissors and replacement blades are sold by MFG under the trademark "SUPERCUT" (see Fig. 1 in Appendix). The word "SUPERCUT" was originally registered by MFG as a trademark on the Supplemental Register in 1954. In 1975 MFG obtained registration No. 1,005,242 on the Principal Register for that same word.

Defendant EMRA Corporation ("EMRA") is a California corporation and owns or franchises several hundred haircutting shops featuring the name "SUPERCUTS" (see Fig. 2 in Appendix). EMRA opened the first such shop in 1975. EMRA also sells shampoo and conditioner to its customers which bear the name "SUPERCUTS." In 1983 one of EMRA's distributors on the West Coast imported 1,210 pairs of scissors bearing the EMRA "SUPERCUTS" logo, some of which were used at the EMRA training center and some of which were sold to various "SUPERCUTS" shops.

Defendant Dion, Inc., is a California corporation involved in the operation of the "SUPERCUTS" shops. Defendants Robert and Julie Parsons are individuals doing business in Illinois under the name "SUPERCUTS." For purposes of these motions all defendants will be referred to collectively as EMRA.

MFG filed suit against defendants alleging violations of MFG's rights under the following theories: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1051 *et seq.;* (2) violation of MFG's common law rights in its trademark; (3) unfair competition; (4) false designation of origin under the Lanham Act; (5) dilution of the mark in violation of the Illinois Anti-Dilution Statute, Ill.Rev.Stat. ch. 140, § 22; and (6) deceptive trade practices in violation of the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, §§ 312–313. MFG seeks injunctive relief and damages, as well as costs and fees.

EMRA asserts the affirmative defenses of laches, estoppel, acquiescence, and unclean hands. EMRA also asserts, as affirmative defenses, that MFG's mark is a weak mark unknown to the general public and that EMRA adopted and continuously used the "SUPERCUTS" mark since prior to MFG's registration. EMRA also coun-

terclaims, alleging unfair competition on the part of MFG in bringing the lawsuit and seeking declaratory relief.[1]

Now EMRA has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all issues presented in the complaint and Count III of the counterclaim, which seeks declaratory relief. MFG has moved for partial summary judgment on the question of whether EMRA infringed MFG's trademark by using haircutting shears bearing the word "SUPERCUTS."

## DISCUSSION

The Seventh Circuit has stated the standards for summary judgment:

> Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if the record shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' It is clear that the party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact.... 'For the purpose of determining whether any material fact remains disputed, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." '

*Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). However, the non-movant may not merely rely on conclusory statements to withstand summary judgment. In responding to a motion for summary judgment, the non-movant must set forth specific facts in affidavits or otherwise show that there are genuine issues that must be decided at trial. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Courts will not strain to find a genuine issue where none exists. *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 559–60 (7th Cir.1970); *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 554 (N.D.Ill.1984).

## I. Trademark Infringement and EMRA's Activities Other Than the Use of Scissors

Defendants contend that EMRA's activities other than the use of scissors marked "SUPERCUTS" (which will be considered separately in part II, *infra* ) do not infringe MFG's trademark. They argue that MFG's mark is weak and therefore has a narrow scope of protection, and that there is no likelihood of confusion between MFG's "SUPERCUT" scissors and blades and EMRA's use of the "SUPERCUTS" mark.

■ Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides, in relevant part:

(1) Any person who shall, without the consent of the [trademark] registrant—

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

The central issue presented is whether EMRA's use of "SUPERCUTS" is likely to cause confusion. Likelihood of confusion is an issue of fact. *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). "In determining whether likelihood of confusion exists, courts consider such factors as the type of trademark in issue, the similarity of design, similarity of products, identity of retail outlets and purchasers, identity of advertising media utilized, defendants intent, and actual confusion." *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 866 (7th Cir.1983); *Union Carbide Corp.*, 531 F.2d at 381–82.

■ The first factor, "type of trademark," is by far the most complex in a legal sense. Trademarks have been classified as "weak" or "strong" and also as being "distinctive" or not distinctive. *See, e.g., Telemed Corp. v. Tel-Med, Inc.*, 588

---

1. EMRA's counterclaim based on abuse of process was dismissed. Order of May 10, 1985.

F.2d 213, 219–20 (7th Cir.1978). In *Telemed*, The Seventh Circuit explained the importance of these classifications:

> In essence, the distinctiveness and popularity of the trademark will determine its relative strength or weakness and will accordingly define the scope of protection to be accorded the mark against the confusing similarity of others. A mark is strong if it is conspicuously distinctive; it is distinctive if the public has already been educated to accept it as the hallmark of a particular source. Then too, a mark can be distinctive either because it is unique, that is, distinctive in itself, because it has been the subject of wide and intensive advertisement, or because of a combination of both.

*Telemed*, 588 F.2d at 219; *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627, 634 (7th Cir.), *cert. denied*, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968); 3 R. Callman, *Unfair Competition and Trademarks*, § 82.1 at 1503–04 (2d ed.). The weaker the mark, the less the likelihood of confusion, and therefore the narrower the scope of protection. *Telemed*, 588 F.2d at 219. This protection may be limited to similar goods similarly marketed. *Id.* Only a strong mark will be protected against infringement arising out of its use in connection with noncompeting goods. *Id.; Westward Coach*, 388 F.2d at 634; 3 Callman, *supra*, § 82.1.

Under *Telemed*, a mark is "conspicuously distinctive" and therefore "strong"

1) because it is "unique" and therefore distinctive in itself,

2) because it has been the subject of wide and intensive advertisement, or

3) because of a combination of both. The "intrinsic" strength of a trademark is determined by placing it along a spectrum in which trademarks are classified as (1) generic or "common descriptive," (2) "merely descriptive," (3) suggestive, or (4) arbitrary or fanciful. *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978).

MFG contends that "SUPERCUT" as applied to scissors is "suggestive" while EMRA argues that it is "merely descriptive." A "merely descriptive" term "specifically describes a characteristic or ingredient of an article" while a "suggestive" term "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Id.* A merely descriptive mark is inherently much weaker than a suggestive mark and less deserving of protection. *Telemed, supra*, 588 F.2d at 217.

■ The "SUPERCUT" trademark is merely descriptive. Webster's Third New International Dictionary defines the prefix "super" as "over and above: higher in quantity, quality, or degree" and the adjective "super" as "of a superfine grade or quality" or "of great worth, value, excellence, or superiority." Webster's at 2292. When followed by the word "cut," signifying both the operation of the scissors and the result it produces, the word "SUPERCUT" describes a scissors that produces a high or superior quality cut or that cuts in a superior fashion.

MFG argues that the word is not descriptive because "cut" is not synonymous with "scissors" or "shear." But similar trademarks have been found to be merely descriptive. *See, e.g., E.F. Drew & Co. v. Pam Industries, Inc.*, 299 F.2d 777 (7th Cir.1962) ("Dri-Fri" for vegetable oil for cooking); *In re Sheaffer Pen Co.*, 158 F.2d 390, 34 CCPA 771 (1946) ("Fineline" for mechanical pencils and lead refills); *In re Colonial Refining & Chemical Co.*, 196 U.S.P.Q. 46 (T.T.A.B.1977) ("Sure Grip" for a nonskid coating); *Andrew J. McPartland, Inc. v. Montgomery Ward & Co.*, 164 F.2d 603, 35 CCPA 802 (1947), *cert. denied*, 333 U.S. 875, 68 S.Ct. 904, 92 L.Ed. 1151 (1948) ("Quick Start" for electric storage batteries).

The Seventh Circuit has identified as "perhaps the best statement of [this] distinction" to be the following:

"[I]f the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive."

*Union Carbide, supra,* 531 F.2d at 379 (quoting A. Seidel, S. Dalroff, and E. Gonda, Trademark Law and Practice § 4.06 at 77 (1963)). It takes no imagination to understand that "SUPERCUT," as applied to scissors, describes a scissors of high quality.

Neither has "SUPERCUT" become a strong and distinctive mark because of wide and intensive advertising on the part of MFG. While MFG spends a substantial amount each year on advertising, this advertising is directed toward all of its hundreds of products, whereas only a few of these products are "SUPERCUT" scissors and blades. Even if the court accepts MFG's representations on the percentage of total advertising directed toward "SUPERCUT" products to be true, as it must for purposes of this motion, this represents but a small percentage of MFG's total advertising.

MFG emphasizes that it has been selling "SUPERCUT" scissors for thirty years. But duration is significant only when an owner "can point to a long period of time during which his mark was used on a great quantity of articles, as symbolic of his business." *Telemed, supra,* 588 F.2d at 219. MFG has used "SUPERCUT" on very few of its products. It markets scissors under other trademarks as well. It has stated in its 10–K form that "none [of its 1,500 products] is significant in itself." Clearly "SUPERCUT" is not symbolic of MFG's business in the way that so many trademarks are.

Trademarks are also considered weak if they are used on a variety of other products by other companies. *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.,* 582 F.Supp. 551, 557 (N.D.Ill.1984) (finding the trademark "Cellini" to be weak because it has been used extensively in connection with a wide range of goods); *see also Telemed, supra,* 588 F.2d at 220 (finding the mark "Telemed" entitled to narrow protection because "tele" and "med" were both extensively used for a variety of business and service names). The prefix "super" has been used for over one hundred marks registered in the area of cutting, hand tools and sidearms, including three registrations for "super-cut" and registrations for "supercutter," "super-snips," and "super-shear."

MFG argues that the incontestable status of its "SUPERCUT" mark renders it distinctive as a matter of law and that it can no longer be found to be weak. However, *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* —— U.S. ——, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), cited by MFG, held only that *the validity* of an incontestable trademark cannot be challenged as merely descriptive. But the validity of MFG's mark is not at issue—only the scope of its protection. "Incontestability does not broaden a trademark in the sense that it allows a registrant to claim rights over a greater range of products than he would otherwise be entitled to claim." *Union Carbide, supra,* 531 F.2d at 377.

Moreover, several of the other factors listed in *Wesley-Jessen* and *Union Carbide* also support the conclusion that EMRA's activities do not create a likelihood of confusion and that there is no genuine issue as to this material fact. There is no identity of retail outlets whatsoever. All of EMRA's services and products are sold through the shops owned or franchised by EMRA. MFG sells its products through supply houses or beauty and barber schools. There is no evidence of any overlapping.

Similarly, there is no identity of purchasers. EMRA sells its services and products to the general public. MFG sells its products to hair care purveyors. These are clearly different markets. MFG argues that EMRA actually sells its products to the owners of the franchised "SUPERCUTS" stores, who are themselves hair care purveyors, and that when analyzed at the proper level of the distribution chain the purchasers are the same. However,

the general public is the proper set of EMRA purchasers for purposes of this analysis. The franchised shops are merely a part of EMRA's distribution chain, just as the wholesale distributors and supply houses are for MFG. *Wesley-Jessen v. Bausch & Lomb, Inc.*, 698 F.2d 862 (7th Cir.1983), cited by MFG, is inapplicable. In *Wesley-Jessen,* both parties manufactured contact lenses and sold them to eye care professionals for sale to the public. There was no other relationship between the parties and their customers than sellers and buyers.

Neither is there any identity of advertising media. EMRA advertises through TV, radio, billboards, and other mass market media directed toward the general public. MFG advertises in beauty and barber trade journals, with direct mailings to the beauty and barber industry, and through its catalog, also directed to the hair care industry. While the parties dispute the amounts spent on advertising, the relevant criteria here is the type of advertising.

Most significant is the total absence of any evidence of actual confusion. MFG contends that this result is faulty because EMRA has allegedly failed to conduct a thorough investigation of its franchisees on this point. But MFG has presented no evidence of its own. Nothing has precluded MFG, a company that has been supplying the hair care industry for thirty years, from surveying that industry on its own or from presenting evidence of actual confusion that has come to its attention during the ten years that EMRA has been using the "SUPERCUTS" trademark. The fact that these two nationwide firms have been coexisting for many years, and that MFG has presented no evidence of actual confusion shows that such confusion is not a factor. *See FS Services, Inc. v. Custom Farm Services, Inc.*, 325 F.Supp. 153 (N.D. Ill.1970), *aff'd,* 471 F.2d 671 (7th Cir.1972).

MFG argues that EMRA learned of MFG's "SUPERCUT" trademark in 1979 and continued to operate and expand under its "SUPERCUTS" label and that this is evidence of EMRA's evil intent. But the court finds this to be of little weight. EMRA submits sworn statements that it did not know of MFG's trademark in 1975 when it began its business. MFG produces no evidence to refute that. Therefore the court concludes in the absence of other evidence that EMRA innocently adopted its "SUPERCUTS" name when it began operations.

It is true that the trademarks themselves are similar to the extent that they use virtually the same word. However, even the significance of that fact is mitigated by the different styles of these trademarks. *See Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 220 (7th Cir.1978). MFG's "SUPERCUT" is in block print on the package and small block print on the scissors themselves (see Fig. 1), while EMRA's trademark is written in a more stylized form (see Fig. 2).

Finally, MFG argues that the products are similar because they are all related to hair care. While it is true that scissors, shampoo, and haircuts are all within some universe of hair care products and services, they are not, of themselves, particularly similar in the way, for example, that scissors and replacement blades are or that shampoo and conditioner are.[2]

In light of the weak and descriptive nature of the "SUPERCUT" trademark, the absence of any actual confusion, and the absence of any identity between purchas-

---

**2.** MFG also argues that its "SUPERCUT" trademark is protected under the Doctrine of Natural Expansion for any goods or services which purchasers might reasonably expect it to expand to in the normal expansion of its business under the mark. But MFG does not suggest that it might expand into haircutting services and the court finds no support for the suggestion that MFG would expand into shampoo and other products under its "SUPERCUT" trademark for two reasons: (1) MFG has never expanded its "SUPERCUT" mark beyond scissors and blades in the thirty years it has been using it (or at least there is no evidence of this) and (2) MFG does currently sell a complete line of other hair care products under dozens of other trademarks. Obviously MFG has long believed that different products are best identified by different trademarks tailored to their particular properties.

ers, retail outlets, and advertising media, the court concludes that there is no likelihood of confusion. Whatever similarity exists between the trademarks and the products is insignificant in light of these other factors and fails to create a genuine issue of fact as to the likelihood of confusion.

The court finds support for this result in *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir.), cert. denied, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968).[3] In *Westward Coach*, the Seventh Circuit affirmed the granting of summary judgment in favor of the defendant, Ford Motor Co. The plaintiff manufactured and sold campers and trailers under the trademark "Mustang" that were designed for mounting on pick-up trucks and for towing. In 1967 Ford began selling its "Mustang" automobile and the plaintiff brought an action for infringement. The court found that the mark "Mustang" was a weak mark because it was a noun of common usage used in connection with a variety of products and was federally registered as a trademark numerous times; that the plaintiff's trademark was limited to the trailer industry; that the plaintiff's trailers did not compete with Ford's sports cars; and that there was no likelihood of confusion. This was true even though the trademarks were virtually identical (both consisted of the word "Mustang" together with a symbol of a horse) and the products were related in the same general way as the products in the present case. Therefore, the court finds that defendants' motion for summary judgment should be granted on Count I as to defendants' activities other than the use of "SUPERCUTS" scissors.

In Count II, MFG alleges that EMRA has violated its common law trademark rights. The same principles applied above would govern the court's analysis in determining whether there is a genuine issue as to any material fact under Illinois law. *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.*, 582 F.Supp. 551, 559 (N.D.Ill.1984). Therefore, for the reasons stated above as to Count I, the court finds that EMRA is entitled to summary judgment on Count II as to the same "non-scissors" activities.

## II. Trademark Infringement and EMRA'S Use of Scissors Marked "SUPERCUTS"

The use by EMRA of scissors marked "SUPERCUTS" clearly presents a different question than EMRA's other activities. These scissors are arguably within the scope of protection afforded MFG's trademark. However, EMRA argues that its use of these scissors was short-lived and discontinued and did not damage MFG. Therefore, EMRA argues, even assuming that its use of these scissors did infringe MFG's mark, there is no reason for the court to grant injunctive relief or damages.

"It is within the discretion of the trial court to grant or deny an injunction against conduct which has ceased and is not likely to recur." *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir. 1982). In *Schutt* the district court had ruled that because the defendant in that trademark and unfair competition case "did not threaten to continue in the conduct complained of—and in fact had discontinued that conduct more than a year prior to the commencement of [the] action—the request for equitable relief was moot." *Id.* at 206.

In the present case EMRA authorized the purchase of 1,210 pairs of scissors bearing the "SUPERCUTS" logo for use in "SUPERCUTS" shops and at EMRA's training center in 1983. These scissors were provided through School Distributors, a division of West Coast Beauty Supply Co., which distributes products to "SUPER-

---

**3.** MFG argues that *Westward Coach* is inapplicable because it is based on Indiana law. However, *Westward Coach* has frequently been cited in cases involving both federal and Illinois trademark law, thus indicating the applicability of its analysis and result. *See, e.g., Telemed Corp., supra,* 588 F.2d at 219 (citing *Westward Coach* as clarifying the significance of strong and weak marks in a federal trademark case); *Victory Pipe Craftsmen, Inc. v. Faberge, Inc.,* 582 F.Supp. 551 (N.D.Ill.1984) (relying on *Westward Coach* in granting summary judgment in a case involving both federal and Illinois law).

CUTS" shops in the western states. The distributor distributed the entire supply of scissors to the EMRA shops and training center in 1983. The distributor declares that it has no intention of reordering such scissors. EMRA asserts that these scissors have since worn out and have been replaced and there is no intention of reordering.

MFG argues that there is a continuing likelihood of infringement through EMRA's reordering of such scissors. The only evidence that MFG provides to support this assertion, however, is a statement by MFG's president, Wilford Gallinat, that "a supplier to EMRA" has contacted MFG for submission of a quotation for scissors bearing the mark "SUPERCUTS" for sale to EMRA. This evidence would, of course, have substantially more value if the supplier were named and there was direct evidence of its intentions. Moreover, while a supplier to EMRA may intend to sell such scissors to EMRA, one cannot infer, without more, that EMRA has any knowledge of this or that it intends to cooperate by buying.

■ Under the circumstances, the court finds that EMRA's use of "SUPERCUTS" scissors was a temporary and discontinued practice and that there is no genuine issue of fact as to whether this practice continues. Therefore the court will follow the example of this court in *Schutt* and refuse to grant injunctive relief.

■ As to the award of damages, "a party seeking such relief is required to show not only the likelihood of such confusion, but must demonstrate that it has been damaged by actual consumer reliance on the misleading statements." *Schutt, supra,* 673 F.2d at 206. Therefore, assuming that EMRA's use of these scissors infringed MFG's trademark, MFG would have to prove that it was damaged by actual consumer reliance. But the scissors marked "SUPERCUTS" were not sold by the EMRA shops; they were used by the employees in the "SUPERCUTS" shops and by those being trained in the "SUPERCUTS" training center. These individuals,

involved as they were in a non-market relationship with the "SUPERCUTS" organization, were not confused by the meaning of the label on the scissors they were using. These individuals understood that the mark was related to the organization for which they worked and not another company with a similar trademark. The court finds, in the absence of any evidence of such confusion, that MFG was not damaged by this practice.

Therefore the court finds that summary judgment should be granted in favor of the defendants on Counts I and II as to EMRA's temporary and discontinued use of "SUPERCUTS" scissors. Together with the result in Part I, *supra,* this requires granting summary judgment in favor of the defendants as to Counts I and II in their entirety.

### III.  Counts III–VI

■ Count IV of the complaint alleges a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false designation of origin. Recovery under 15 U.S.C. § 1125(a) requires plaintiff to establish that defendants have created a likelihood of confusion as to the origin of their products. *Hooker v. Columbia Pictures Industries,* 551 F.Supp. 1060 (N.D.Ill.1982). Under both 15 U.S.C. § 1114 and 15 U.S.C. § 1125, the same test is applied to determine whether a particular activity violates the Lanham Act: likelihood of confusion. *Invicta Plastics (USA) Ltd. v. Mego. Corp.,* 523 F.Supp. 619, 622 (S.D.N.Y.1981). Therefore, for the reasons stated in Parts I and II, *supra,* defendants' motion for summary judgment is granted as to Count IV.

■ Count III alleges a violation of common law unfair competition. Under Illinois law, unfair competition is a broader concept than trademark infringement in that it allows consideration of the whole product, rather than just the trademark, when evaluating the likelihood of confusion. *Thompson v. Spring-Green Lawn Care,* 126 Ill. App.3d 99, 466 N.E.2d 1004, 1015, 81 Ill. Dec. 202, 213 (1st Dist.1984). However, a finding of unfair competition still requires

that likelihood of confusion exists as to the source of plaintiff's goods. *Id.* Since likelihood of confusion does not exist on the basis of the parties' trademarks, and since nothing else about their products and services increases the likelihood of confusion, the court concludes that no such requisite likelihood exists and that summary judgment should be granted for defendants as to Count III.

■ Count V alleges a violation of the Illinois Anti-Dilution Act, Ill.Rev.Stat. ch. 140, § 22. An action for dilution requires that plaintiff show his mark to be a strong mark which has acquired a widespread reputation through much effort or costly and extensive advertising and which has a distinctiveness or secondary meaning. *Thompson, supra,* 466 N.E.2d at 1015, 81 Ill.Dec. at 213. As discussed in Part I, *supra,* MFG's mark is not a strong mark. Therefore summary judgment should be granted for defendants as to Count V.

■ Count VI alleges a violation of the Illinois Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121½, §§ 312–313. Plaintiff alleges that defendants have violated this statute by causing a likelihood of confusion as to the source of their goods and services with respect to plaintiff's mark and products. "Likelihood of confusion" has the same meaning under the Deceptive Trade Practices Act as it has in trademark infringement cases. *Hooker v. Columbia Pictures Industries,* 551 F.Supp. 1060, 1064 (N.D.Ill.1982). Therefore summary judgment must be granted for defendants as to Count VI.

## IV. Declaratory Relief

Finally, defendants seek summary judgment as to Count III of their counterclaims, which seeks declarations regarding non-infringement. The findings and conclusions set forth above support a declaration that as to its products other than scissors defendants have not infringed plaintiff's trademark. Declaratory judgment is denied as to the infringement of plaintiff's trademark on its scissor's product.

IT IS THEREFORE ORDERED that:

(1) Defendants' motion for summary judgment as to Counts I–VI of the complaint is granted and the complaint is dismissed.

(2) Plaintiff's motion for partial summary judgment is denied.

(3) Defendants' motion for summary declaratory judgment as to Count III of the counterclaim is granted in part and denied in part as set forth in the court's opinion.

(4) Count I of the counterclaim is dismissed with the consent of the defendants.

APPENDIX·

NO MORE SHEAR SHARPENING!

*New Improved*

**N** 22

**MEDIUM-WEIGHT**

SUPERCUT *Detachable Blade* HAIR CUTTING SHEAR

COMES with EXTRA SET of QUICK-CHANGE BLADES

*Cuts Hair Easier!*
*Great for Tapering!*

Now better than ever . . . with improved blade tension. Cuts better and easier. It's the sharpest shear made. The blades are hollow-ground and corrugated to a razor edge and custom heat-treated for uniform temper. Extra blades cost about the same as a sharpening job. You can throw dull blades away. No more shear sharpening. IMPORTANT: the blades have been dipped in oil to guard against rust and to protect the cutting edges. Before using, remove the oil from the corrugated edge of each blade with a towel or brush. This will give you a clean cutting edge for best results.

*Made for and distributed by*
**MORRIS-FLAMINGO, INC.**
DANVILLE, ILL.
Made in U. S. A.

FIG 1

we cut hair for your ego not ours. .

Be Our Guest

FIG. 2